## UNITED STATES v. MARYLAND & VIRGINIA MILK PRODUCERS' ASS'N, Inc. et al.

Cr. No. 294–48.

United States District Court
District of Columbia.

May 15, 1950.

See also, D.C., 9 F.R.D. 509.

Robert H. Winn, E. Riggs McConnell, Edward Knuff, F. Kirk Maddrix, and Clarence M. Thomas, all of Washington, D. C., for the United States.

Elwood H. Seal, William E. Leahy, and William J. Hughes, Jr., all of Washington, D. C., for the defendant Maryland and Virginia Milk Producers Association, Inc.

Roger J. Whiteford, John J. Carmody, and Jo. V. Morgan, Jr., all of Washington, D. C., for the defendant Chestnut Farms-Chevy Chase Dairy Company.

Samuel O. Clark, Jr. and W. V. T. Justis, both of Washington, D. C., for the defendant Thompson's Dairy, Inc.

W. Gwynn Gardiner, of Washington, D. C., for the defendant Richfield Dairy Corporation.

John F. Hillyard, of Washington, D. C., for the defendant Simpson Bros., Inc.

Arthur B. Hanson, Elisha Hanson, and Calvin H. Cobb, Jr., all of Washington, D. C., for the defendant Safeway Stores, Inc.

William Blum, Jr., of Washington, D. C., for the defendant Alexandria Dairy Products Company, Inc.

Ralph W. Powers, of Washington, D. C., for the defendant Harvey Dairy, Inc.

William E. Leahy and William J. Hughes, Jr., both of Washington, D. C., for the defendant B. B. Derrick.

HOLTZOFF, District Judge.

This case is now before the Court on a motion of the defendants for a judgment of acquittal. This is a criminal prosecution on a charge of conspiracy to violate Section 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 3, the pertinent provisions of which read as follows: "Every contract, combination * * * or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal."

The defendants are charged with restraining trade and commerce in milk between the District of Columbia and some of the states as well as within the District of Columbia. The defendants waived their rights to a trial by jury and consented to be tried by the Court alone.

At the close of the Government's case, the defendants moved for a judgment of acquittal.

■ The principles to be applied in determining a motion for a judgment of acquittal in a criminal case were well summarized by the Court of Appeals in Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, in the following words: "The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. In a given case, particularly one of circumstantial evidence, that determination may depend upon the difference between pure speculation and legitimate inference from proven facts."

■ Substantial evidence of guilt is required to justify the submission of a case to the jury. A mere scintilla of evidence is not enough.

■ Although this is a trial without a jury, the motion for a judgment of acquittal at the close of the Government's case performs the same functions and is governed by the same considerations as a similar motion at a trial by jury.

■ The Sherman Anti-Trust Act provides two methods of enforcement: a criminal prosecution and a civil action for an injunction. In this case the government has chosen to proceed by way of an indictment. Consequently, all the rights and safeguards that hedge a defendant in a criminal case are to be extended to the defendants in this proceeding. The additional burden that must be borne by the government in a criminal case, as compared with a civil action, must be carried by the government in this instance.

■ Thus, the defendants are clothed with a presumption of innocence which attaches to them throughout the trial. The government has the burden of proving guilt beyond a reasonable doubt. If the evidence on which the government relies is entirely circumstantial, it must be of such character as to exclude every reasonable hypothesis except that of guilt. A conspiracy may, indeed, be established by circumstantial evidence. Nevertheless, such evidence must meet the standard just mentioned. Thus the onus that must be borne by the government is much heavier than would have to be sustained by it in a civil case. The government has, however, made its choice. The principles that I have just summarized are purely elementary but it is at times useful to bring back to mind elementary principles.

The defendant Maryland & Virginia Milk Producers' Association is a cooperative association of farmers who ship milk to the City of Washington and its environs, and who are generally called "producers." The individual defendant B. B. Derrick is the Secretary-Treasurer of the association. The remaining seven defendants are corporations that are engaged in the business of selling and distributing milk at retail and wholesale in Washington and nearby Maryland and Virginia. Each of them purchases all or most of its supply of milk from the producers' association which, in turn, acts as the exclusive agent for its members.

It is charged in substance that the defendants have combined to restrain trade and commerce in milk, to fix the prices at which milk should be sold by the producers to the distributors and by the distributors to the public, and to suppress competition.

The government contends that the proof justifies a finding that this conspiracy has been effectuated in three distinct ways.

First, the government charges that the defendants have developed and operated a scheme of exclusive or so-called "full supply" contracts entered into between the Producers' Association and each distributor, whereby the latter agrees to buy his entire supply of milk from the Association and the Association undertakes, in turn, to furnish all the milk required by the distributor. An integral part of this series of arrangements is claimed to be a uniform method of computing the price to be paid by each distributor for the milk purchased by him. It is an elaborate formula, known variously as the classification plan or as the use plan. All milk sold to the distributors is divided into three classes according to the manner in which the milk is used by them. Class 1 consists of milk resold by the distributors as fluid milk. Class 2 is composed of milk transformed into cream. Class 3 comprises all unsold or surplus milk that each distributor finds on his hands and which he sells for manufacture into by-products such as ice cream, cheese, and other dairy products. A different price is paid for the milk in each category, although in each instance the milk is of the same grade and quality. The Association periodically audits the books of every distributor in order to ascertain the amount used from him.

Second, the government charges that the prices to be paid by the distributors were fixed by the joint action of the Producers' Association and the distributors. The illegality in this procedure is claimed to be found in the fact that each distributor did not negotiate with the Producers' Association individually and separately, but that all the distributors bargained with the Association collectively as a group.

Third, the government charges that the Producers' Association and the distributors jointly fixed prices to be charged to the consumer.

As a matter of convenience, the Court will discuss the second and the third aspect of the government charges before considering the first phase.

At the outset the status of the Producers' Association should be noted. It is a corporation constituting a cooperative association of farmers shipping milk to the Washington milk shed. It acts as the exclusive sales agent for its members.

The Supreme Court has upheld an arrangement whereby the producers of coal within a specified area sold their entire product to the same exclusive agency. Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825.

It is not necessary, however, to consider this aspect of the matter since farmers' cooperatives are expressly exempted from the provisions of the antitrust laws. Farmers have a special dispensation. They may combine with impunity. In so doing they may fix prices and restrain trade and commerce.

Thus, Section 6 of the Clayton Act, 15 U.S.C.A. § 17, provides in part as follows: "Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

This provision was broadened by the Capper-Volstead Act, 7 U.S.C.A. § 291, the pertinent provisions of which read as follows: "Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes." The balance of the section contains certain

limitations which are not material for the purposes of this case.

■ Consequently, the Maryland and Virginia Milk Producers' Association, in marketing the milk shipped by its members, and acting as their agent for that purpose, does not violate the Sherman Anti-Trust Act, even if in so doing it fixes prices and restrains trade. Its impunity ends, however, at the point where it commences to act in concert with others. Its exemption ceases when it crosses the line of individual action and combines with other persons who are not farmers. The Court of Appeals, D.C.Cir., 179 F.2d 426, so held in this case and its ruling is the law of the case.

The Supreme Court also reached the same conclusion in United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

The conclusion necessarily follows that the Producers' Association may not be found guilty unless it conspired with the distributors and the resulting conspiracy was in violation of the Sherman Act. The activities of the Association, standing alone, may not be deemed a violation of the statute.

■ The evidence introduced by the government tends to show that the Board of Directors of the Producers' Association from time to time fixed the prices to be charged to the distributors. Whenever the price was changed defendant Derrick, as Secretary-Treasurer of the Association, called a meeting of the distributors or their representatives. At this gathering he announced the new price. Occasionally some of the distributors protested or asked for a reduction, but to no avail. In other words, the price was not fixed as a result of negotiations or discussions between representatives of the association and the distributors. It was determined by the association and imposed on the distributors. The fact that the announcement was made in a meeting at which all distributors were present, instead of to each distributor separately does not constitute a violation of law. A conviction of a crime may not be predicated on such a hair-splitting refinement or finespun distinction.

■ The conclusion is inescapable that there is no substantial evidence to sustain a finding that the Producers' Association combined with all the defendant distributors to fix the prices that the latter were to pay to the Association.

■ We now pass to the third aspect of the alleged conspiracy, namely, the fixing of prices to consumers. There is no evidence whatever that the Producers' Association participated in any manner in determining prices to be charged to the consumers, except that on one occasion when a competitor of one of the defendant distributors reduced his retail prices, the Association temporarily committed itself to a price that would enable that distributor to withstand the competition. This activity is hardly a participation in a conspiracy to fix prices.

■ The government offered in evidence lists of prices charged by the defendant distributors to their consumers. The government contends that the prices were changed by all of them on the same day and by the same amount, and seeks to draw an inference that this was done in concert. This contention is untenable, for two reasons.

■ First, the compilation of the lists shows that, as a matter of fact, prices were not always changed by all the distributors on the same day or by the same amount. Secondly, as was recently held by the Court of Appeals for the Eighth Circuit in Pevely Dairy Co. v. United States, 178 F.2d 363, 369: "We are clear that mere uniformity of prices in the sale of a standardized commodity such as milk is not in itself evidence of a violation of the Sherman Anti-trust Act."

■ Whatever might be the case were this a civil action for an injunction, this evidence does not warrant a finding of guilt on this aspect of the charge.

■ This brings us back to the first and the most difficult aspect of the alleged conspiracy, namely, the use of exclusive or full supply contracts in conjunction with the classification or the use plan. The Producers' Association brings to the District

of Columbia and its environs, roughly, about 80 percent of the milk sold in that area. Prior to 1938 most or all of the distributors who purchased their supply from the Producers' Association were bound to it by a written, iron-clad "full supply" contract. Such contracts, standing alone and containing no other provisions, are not necessarily illegal.

In Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, the Supreme Court, by vote of five to four, held that a series of such contracts under the circumstances of that case constituted a violation of the Clayton Act, which contains no criminal sanctions, but expressly left open the question whether the use of such contracts was in contravention of the Sherman Act.

In the case at bar most of the "full supply" contracts were cancelled in 1938 and have never been renewed or restored. Most of the distributors who purchase from the Producers' Association do so on a day-to-day basis without any written contract. This is true of the two largest distributors, who handle about seventy percent of the milk sold by the Producers' Association: Chestnut Farms-Chevy Chase Dairy Company and Thompson's Dairy, Incorporated. A few of the smaller distributors, however, who constitute a minority of the entire group, continued their written "full supply" contracts. These contracts were still in effect immediately prior to the return of this indictment.

There may be some possible basis for a suspicion that there also existed an informal, tacit understanding between the Producers' Association and the other distributors that the latter would deal exclusively with the Association, which, in turn, would supply their entire needs. Suspicion, however, is not evidence. The evidence, on the other hand, is entirely compatible with the contention that no such informal agreements exist, but that these distributors buy solely from the association purely as a matter of free choice, because in that manner they are assured of a reliable source of a large daily supply without which they could not properly serve their customers. Moreover, there are isolated instances of sporadic purchases by the distributors from sources outside of the Association.

In 1940 the Producers' Association and the distributors entered into a formal marketing agreement under the Agricultural Marketing Act, 50 Stat. 246, as required by the statute, the Secretary of Agriculture was a party to this contract. The classification plan was one of the features of this agreement. The pertinent parts of the applicable provisions of the statute read as follows, 7 U.S.C.A. § 608b: "In order to effectuate the declared policy of this chapter, the Secretary of Agriculture shall have the power, after due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, only with respect to such handling as is in the current of interstate or foreign commerce or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful."

Section 608c of the statute elaborately sets forth in detail the procedure by which marketing agreements may be entered into and the provisions which may be included in the orders made by the Secretary or Agriculture in connection therewith. It expressly authorizes recourse to a classification plan for arriving at prices of milk.

The intent of the Congress in enacting this statute seems clear. Marketing agreements, with prices to be fixed on the basis of some formula, seem necessary and desirable with regard to such agricultural products as milk. Yet, obviously such agreements might run afoul of the antitrust laws. The Congress, therefore, expressly authorized the making of such agreements and exempted them from the antitrust laws, but, in order to safeguard the public, it placed such agreements under governmental supervision. In other words, in order to secure exemption from the antitrust laws, persons entering into such marketing agreements were required to sub-

mit themselves to regulation by the Secretary of Agriculture. The classification plan, in some form or another, was an inherent feature of such agreements as applied to milk.

The classification plan for arriving at the price of milk is generally regarded as economically sound because of the unique and exceptional features of the industry. By this means, however, the price is fixed more or less artificially—and I do not use "artificially" in any opprobrious sense—and is not reached as the result of the free play of the forces of competition, or the unrestrained operation of the law of supply and demand. The efficacy of the classification plan in this instance is aided by several "full supply" contracts.

The power to determine or fix prices from time to time involves potential danger. In the hands of unscrupulous or rapacious men, such power may be wielded to the disadvantage and detriment of the public. It may become oppressive as against competitors, and tyrannical as against consumers. In this case, to be sure, there is no evidence of the misuse of the power. The antitrust laws, however, are not aimed solely against abuse of the power to restrain trade unreasonably. They are directed against the very existence of the power. The Congress, no doubt having these considerations in mind, annexed a condition to the permission to enter into marketing agreements and to use the classification plan without regard to the antitrust laws. The condition is that the parties to the agreement should subject themselves to the supervision and regulation by the Secretary of Agriculture. The Agricultural Marketing Act should, therefore, be construed as authorizing marketing agreements and the use of the classification plan, and exempting them from the antitrust laws, provided the parties submit to supervision and regulation by the Secretary of Agriculture. Any other construction of the Act would render it nugatory and futile.

The interpretation that this Court is placing upon the Agricultural Marketing Act is in harmony with that reached by the Supreme Court in United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181.

In this instance the marketing plan remained in effect from 1940 to March 31, 1947. During the latter part of 1946 the Producers' Association became restive and began to chafe under the agreement. Its members became indignant at the action of the Secretary of Agriculture in adjusting the price of milk in accordance with the fluctuations of the price of butter on the Commodity Exchange in New York. This attitude does not seem to be entirely unreasonable, since prices on commodity exchanges are affected by speculative influences and, therefore, farmers in Maryland and Virginia might have had good ground for objecting to the linking of the prices of their milk to the price of butter on the New York Commodity Exchange. It is not for this Court, however, to pass on the reasonableness of the Secretary's action. The fact remains that, irrespective of what its reason or purpose might have been, the Producers' Association had a legal right to withdraw its assent to the marketing agreement. This is what the association did. The marketing agreement ceased to be effective as of March 31, 1947, and has not been renewed.

The Producers' Association and the distributors continued to operate, however, in the same manner as they did under the marketing plan. The "full supply" contracts with four of the distributors—Safeway Stores, Incorporated; Richfield Dairy Corporation; Harvey Dairy, Incorporated; and Alexandria Dairy Products Company, Incorporated, expressly incorporated by reference the provisions of the marketing agreement. The price was still to be determined on the basis of the classification plan embodied in the marketing agreement which had been abandoned. The only difference in the situation was that the Producers' Association liberated itself from government control. It retained the benefits and advantages of the marketing agreement but repudiated its burdens. In the opinion of the Court it could not legally do both. No doubt the Producers' Association assumed in good faith that it was acting with-

in its rights. In this, however, it was mistaken.

The Court is of the opinion that "full supply" contracts which embodied the classification plan for arriving at the price of milk constituted, in effect, agreements to fix prices. It is well settled that an agreement to fix prices of a commodity is *per se* an unreasonable restraint of trade and, therefore, a violation of the Sherman Act. This principle was laid down in two leading cases decided by the Supreme Court: United States v. Trenton Potteries, 273 U.S. 392, at page 397, *et seq.,* 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and United States v. Socony Vacuum Oil Co., 310 U.S. 150, at page 212 *et seq.,* 60 S.Ct. 811, 84 L.Ed. 1129.

The conclusion is inescapable that there is substantial evidence justifying a finding that the operation of the "full supply" contracts embodying the classification plan constituted a scheme for controlling and fixing prices of milk sold by the Association to the distributors, and, therefore, is an illegal restraint of trade in contravention of Section 3 of the Sherman Act.

In justice to all, it should be observed that there is no evidence that any of the defendants acted in bad faith or that any of the defendants was actuated by any malevolent motive or pursued an evil design, or that any defendant engaged in any unethical practice, or in any manner oppressed either any competitor or the public. Moreover, there is no evidence that the prices fixed were unreasonable or that either the competitors or the consuming public were in any way actually harmed or prejudiced. There is an honest difference of opinion between the Government and some of the defendants as to whether the course of conduct just described was permitted by law. This question could well have been settled by a civil action without a criminal prosecution with all its implications.

In view of the considerations just summarized, the motion for a judgment of acquittal is granted in respect to those defendants who were not parties to "full supply" contracts during the three-year period immediately preceding the filing of the indictment, to wit, Chestnut Farms-Chevy Chase Dairy Company; Thompson's Dairy, Incorporated, and Simpson Brothers, Incorporated.

The motion for a judgment of acquittal is denied in respect to the remaining defendants, to wit, Maryland & Virginia Milk Producers Association; Alexandria Dairy Products Company, Incorporated; Richfield Dairy Corporation; Harvey Dairy, Incorporated; Safeway Stores, Incorporated, and B. B. Derrick.

As to the latter group of defendants this proceeding will be limited and restricted to the subject of "full supply" contracts embodying the classification plan.