## MARYLAND & VIRGINIA MILK PRODUCERS ASS'N, Inc. v. UNITED STATES.

## DERRICK v. UNITED STATES.

Nos. 10662, 10665.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 13, 1951.

Decided Nov. 8, 1951.

Fahy, Circuit Judge, dissented.

———◆———

William E. Leahy, Washington, D. C., with whom Elwood H. Seal and William J. Hughes, Jr., Washington, D. C., were on the brief, for appellants.

Mr. Robert H. Winn, Sp. Asst. to the Atty. Gen., with whom Joe F. Nowlin, Sp. Asst. to the Atty. Gen., was on the brief, for appellee. George Morris Fay, U. S. Atty. at the time of argument, and Charles H. Weston, Atty., Department of Justice, Washington, D. C., also entered appearances for appellee. Charles M. Irelan, Washington, D. C., appointed U. S. Atty. subsequent to the argument in this case, also entered an appearance for appellee.

Harry Scharnikow, Washington, D. C., and Marion R. Garstang, Washington, D. C., filed a brief amicus curiae on behalf of National Milk Producers Federation, urging reversal.

Before CLARK, WILBUR K. MILLER and FAHY, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The Maryland and Virginia Milk Producers Association is a corporate co-operative whose 1,500 producer members furnished 80 per cent of the milk distributed to consumers in the Washington metropolitan district during the period pertinent here. Seven distributing corporations accounted for 85.4 per cent of the milk and cream sold at retail in the area.[1] In 1948 the Association, its secretary-treasurer, Bruce B. Derrick, and the seven distributors were indicted for conspiring to restrain trade in the District of Columbia in violation of § 3 of the Sherman Act, 26 Stat. 209, ch. 647, § 3, 15 U.S.C.A. § 3, which is in part as follows:

"Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal."

The paragraphs of the lengthy indictment which describe the nature and effect of the alleged conspiracy are reproduced in the margin.[2]

1. Chestnut Farms-Chevy Chase Dairy Company, 43.7 per cent; Thompson's Dairy, Inc., 15.3 per cent; Safeway Stores, Inc., 12.3 per cent; Alexandria Products Company, Inc., 5.1 per cent; Harvey Dairy, Inc., 3.8 per cent; Wakefield Dairy (Simpson Bros., Inc.), 3.7 per cent; Richfield Dairy, Inc., 1.5 per cent.

2. "IV. The Conspiracy

"35. Beginning about the year 1930, the exact date being unknown to the Grand Jurors, and continuing thereafter up to and including the date of the return of this Indictment, the defendants have knowingly and continuously engaged in a wrongful and unlawful conspiracy to eliminate and suppress competition in the sale of milk to and the purchase of milk by defendant distributors, and in the sale of fluid milk and cream and milk products by the defendant distributors to consumers and other purchasers in the Washington metropolitan area, which combination and conspiracy has been and now is in restraint of trade and commerce in milk and milk products

It was charged that continuously from 1930 to March 8, 1948, the date of the indictment, the Association, Derrick, and the seven dairy defendants unlawfully conspired to and did fix the wholesale and retail prices of milk, cream and milk prod-

within the District of Columbia and between the District of Columbia and States of the United States, all in violation of Section 3 of the Act of Congress of July 2, 1890, entitled 'An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies' commonly called the Sherman Act (Title 15, U.S.C., Sec. 3).

"36. The aforesaid conspiracy has consisted of a continuing agreement and concert of action among the defendants, the substantial terms of which has [sic] been:

"(a) That the defendant distributors enter into written and verbal contracts and agreements with the defendant Association to purchase their entire requirement of milk from defendant Association, to the extent that said defendant Association is able to supply said requirements, and to cease and refrain from the purchase of milk from producers who are not members of the defendant Association, and from other sources.

"(b) That the Association enter into written and verbal contracts and agreements with the defendant distributors to supply said defendant distributors with their full requirements of milk to the extent that the Association can do so.

"(c) That the defendant Association charge to each of said defendant distributors for milk delivered in the District of Columbia the same price for milk of equal grade and class as it is charged to each of the other defendant distributors receiving milk in the District of Columbia.

"(d) That the defendants agree that the Association refuse to supply milk to any distributor in the District of Columbia or the Washington metropolitan area who has not agreed to purchase his full requirements of milk from said Association, at prices as low as the prices charged by the Association to defendant distributors.

"(e) That the defendants agree upon a classification of milk in three classes having no relationship to purity or quality, said classification to be governed and determined by the use to which milk is put by each of the defendant distributors.

"(f) That the defendants agree that milk which is re-sold by defendant distributors in the form of fluid milk shall be designated as Class I milk; that milk which is used by defendant distributors in cottage cheese, pot cheese, and baker's cheese, or which is separated by defendant distributors into cream and skimmed milk, the cream from which is sold by said defendant distributors in the form of fluid cream, shall be Class II milk; and that milk which is processed into manufactured milk products or which is separated into cream and skimmed milk, the cream from which is processed into a form other than fluid cream or sold for manufacturing purposes, shall be Class III milk.

"(g) That defendants agree upon the price, or upon a formula which shall be applied in the calculation of the price paid by defendant distributors to defendant Association for each class of milk, and that the price paid for Class I milk be higher than the price paid for Class II milk, and that the price for Class II milk shall be higher than the price paid for Class III milk.

"(h) That the defendants agree that the defendant distributors shall not resell as fluid milk to consumers or other purchasers any milk which is purchased by them from the defendant Association at a price below the Class I price agreed upon among the defendants.

"(i) That the Association persuade and induce the Health Department of the District of Columbia, under the guise of health regulations, to prevent the importation of milk into the District of Columbia from sources outside of the States of Maryland and Virginia and from producers who have not been inspected and licensed by the District health authorities.

"(j) That the defendants agree among themselves to abandon and to cause to be terminated a milk marketing order of the United States Department of Agriculture affecting milk prices in the Washington metropolitan area (Order No. 45, as amended, regulating the handling of milk in the Washington, D. C., marketing area) following determination by said defendants that the effect of said Order, if continued, would result in a reduction in the price to be paid by distributors for milk, and in the price to be charged for fluid milk and cream to consumers and other purchasers in the District of Columbia and the metropolitan Washington area.

"(k) That the defendants agree to persuade and induce the Virginia State Milk Marketing Commission to promul-

ucts in the District of Columbia. This was largely accomplished, the indictment said, through "full supply contracts" between the Association and the dairies which required the latter to buy their entire supply from the former and to pay therefor vary-

gate orders fixing minimum prices applicable to the purchase of milk and to the sale of fluid milk and cream by distributors in Arlington County and in Alexandria, Virginia, which said orders would eliminate provisions appearing in previous orders of the Virginia State Milk Marketing Commission, and in the terminated order of the United States Department of Agriculture, providing for a seasonal reduction in the minimum prices to be paid to producers for milk in the spring months of the year, and providing for a further decrease in the minimum prices for milk to be paid to producers in the event of a decline in the .wholesale price of butter below a certain figure.

"(l) That the defendants agree to adopt and apply to purchases of milk for re-sale as fluid milk and cream in the District of Columbia and in Montgomery and Prince Georges Counties, Maryland, the minimum prices, classifications, and terms and conditions so established and promulgated by the Virginia State Milk Marketing Commission for application in Arlington County and Alexandria, Virginia.

"(m) That the defendants discuss and agree upon the prices at which the defendant distributors shall sell fluid milk and cream to consumers and other purchasers in the District of Columbia and in the Washington metropolitan area.

"(n) That the defendants agree that whenever the amount of milk available for sale by the defendant Association exceeds the amount of milk which the defendant distributors can resell as fluid milk and cream at the prices fixed and agreed upon, the defendants will remove this so-called 'excess milk' from the market by converting said milk into products other than fluid milk and cream.

"(o) That the defendants agree that the defendant distributors will remove from the market the 'excess milk' as alleged in sub-paragraph (n) of this paragraph, even though said defendant distributors may be required thereby to suffer a financial loss on the handling of the so-called 'excess milk'.

"(p) That the defendants agree that the Association will prevent and eliminate competition in the sale of fluid milk and cream from distributors who do not have full supply contracts with the Association, and eliminate and suppress price competition in the sale of .

fluid milk and cream by distributors, by inducing and persuading distributors not to cut prices; by attempting to deprive non-contracting price-cutting distributors of an adequate supply of milk; by supplying milk to defendant distributors at prices below Class I prices for use by said defendant distributors to take away contract business from the price-cutting non-contracting distributors; by interfering with the ability of producers to transport milk to price-cutting non-contracting distributors; by forcing price-cutting non-contracting distributors out of business or into bankruptcy; and by other means.

"37. For the purpose of forming and effectuating the aforesaid conspiracy, the defendants by agreement and concerted action have done the things which, as hereinbefore alleged, they conspired to do.

### V. Effects of the Conspiracy

"38. The conspiracy, as alleged in this Indictment, has had the effect as intended by the defendants, of:

"(a) Securing for the defendants control of the production, sale and distribution of approximately 80% of the milk consumed in the Washington metropolitan area, and the power to fix and control the prices of milk within said area.

"(b) Creating in the Washington metropolitan area a rigid and artificial pricing structure in the sale of fluid milk which has been isolated and insulated from the normal influences which determine the prices of milk and milk products elsewhere in the United States.

"(c) Increasing prices to consumers and other purchasers of fluid milk sold by defendant distributors in the Washington metropolitan area.

"(d) Causing defendant distributors to base their selling prices for fluid milk upon the Class I price which they have agreed to pay for milk, rather than upon the average cost of all milk of equal quality and purity secured by said defendant distributors, which is lower than the Class I price.

"(e) Depriving consumers in the Washington metropolitan area of the opportunity to buy fluid milk at prices based upon the average cost of all milk of equal quality and purity purchased by said defendant distributors.

"(f) Depriving consumers in the Washington metropolitan area of the opportunity to buy fluid milk at prices

ing prices according to the way the milk was utilized by them. These contracts, the government said in summarizing the indictment, "created a rigid and artificial pricing structure in the sale of fluid milk without regard for the normal forces of competition."

The nine defendants were further accused of eliminating and suppressing competition, at both the wholesale and the retail level, by preventing the importation of milk from sources other than the Association's 1,500 members, and by other oppressive practices. They were also charged with unlawfully inducing and persuading governmental agencies, having to do with the regulation of the milk supply, to adopt regulations and policies which were not in the public interest, but in the interest of the conspirators.

Judge Richmond B. Keech, of the United States District Court for the District of Columbia, dismissed the indictment, holding that the facts stated did not constitute a violation of § 3 of the statute. On the government's appeal from the order of dismissal, this court reversed by a two to one vote. 85 U.S.App.D.C. 180, 179 F.2d 426. The nine defendants were then tried before District Judge Alexander Holtzoff without a jury. Derrick, Safeway, Richfield and the Association were found guilty; the others were acquitted. D.C., 90 F.Supp. 681. Derrick and the Association appeal.

The full supply contracts, each containing a utilization-classification pricing arrangement, between the Association and Safeway and between the Association and Richfield, were the bases of their convictions. The agreements required the Association to supply the two distributors' needs to the extent of its ability to do so; but if the Association were unable to fill their requirements, the distributors could go elsewhere. Thus the contracts were not exclusive to the extent of altogether prohibiting purchases from outside sources.

The contract between the Association and Safeway [3] contained the following provision:

"(3) Distributors shall pay to the Association for all milk and/or cream sold and delivered to it by the Association the minimum prices, according to the use to which said milk and/or cream is put, in the manner and in the amount provided for in the Marketing Agreement and Order for the Washington Marketing Area, which agreement has been approved by the United States Secretary of Agriculture and became effective February 1, 1940. A copy of said Marketing Agreement and Order is attached hereto as Exhibit 'A' and by reference made a part hereof."

A similar provision appears in the Richfield contract.

Under the classified use plan, milk which is utilized by the distributors for resale in fluid form is known as Class I and is paid for at the highest of three prices. Class II is milk used for cream and cottage cheese, and Class III is that which is converted into manufactured products. At the time of the trial the prices of Classes II and III were identical. This classified use system has been employed in the industry since 1916. It was one of the features of a formal marketing agreement executed in 1940 between the Association and the distributors under the Agricultural Marketing Act,[3a] a contract to which the Secretary of Agriculture was a party.

The Association cancelled this agreement as of March 31, 1947, as it had a right to do under the Act itself. The reason for cancellation was that, over the Association's protest, the Secretary had made the price of milk in the District of Columbia.

based upon the price of milk imported from other markets.

"(g) Causing a reduction in the amount of milk consumed as fluid milk in the Washington metropolitan area by fixing and maintaining prices at a level higher than a great many consumers can afford to pay.

"(h) Depriving independent, non-Association producers of milk of an opportunity to sell their milk to defendant distributors.

"(i) Depriving non-defendant distributors of the opportunity to buy milk produced by the 1500 producers who are members of the defendant Association."

3. The contract originally was made with Lucerne, a subsidiary of Safeway.

3a. 7 U.S.C.A. § 601 et seq.

area depend upon the price of butter in the speculative New York market. As Mr. Hooper, an officer of the Association, testified to this effect, Judge Holtzoff remarked: "I do not quite understand * * why the price of butter in the New York market should affect the price of milk in the Washington market," to which Mr. Hooper replied, "We couldn't understand the connection either, your Honor, and that is one of the reasons that order went out." In September, 1946, the Association requested the Secretary to suspend the formula because the use of it would increase the local price of milk and the Association thought economic conditions surrounding the production of milk in the District of Columbia area did not warrant a rise in the price. The Secretary refused to suspend the formula. The New York butter price increased in November, 1946, but the Association refused to accept the resulting increase in the milk prices.

The government proved that a full supply contract between the Association and Safeway, executed June 11, 1940, had been continuously effective since that date. A similar contract between the Association and Richfield was shown to have been effective since December 11, 1946. Full supply contracts with Chestnut Farms, Thompson's Dairy and Simpson Bros., Inc., formerly in effect, had been terminated September 30, 1938.

Witnesses for the government testified that the prices to be paid to the Association by Safeway and Richfield were not fixed by joint action of the four convicted defendants, but were decided upon by the Association and imposed upon the dairies. Thus the prosecution's own proof refuted the charge that the appellants and those two dairies conspired to and did fix wholesale prices. With commendable candor, the government concedes in its brief that the Association alone determined wholesale prices.[4]

Government witnesses also testified that the Association had nothing whatever to do with fixing retail prices. Those prices, the evidence showed, are not always uniform. In fact, we were told in argument that Safeway sells milk for two cents per quart less than Richfield charges. There was no proof of a conspiracy to fix prices, either wholesale or retail.

The government failed to prove that the defendants had conspired to suppress, or that any of them had suppressed, competition from independent sources of supply. It proved just the opposite by showing that in 1942, when the war caused a vast increase in the population of the Washington metropolitan area and a consequent increased demand for milk which all the producers in the area combined were unable to meet, the Association and the other defendants co-operated in bringing in from outside, and sometimes far removed, sources enough milk to supplement the local supply sufficiently to meet the public demand. Without charge, the Association worked to find the outside milk and obtained it for the distributors.[5] On one

4. The paragraph of the government's brief containing the concession is as follows: "From 1940 to 1947, producer prices were determined by the Secretary of Agriculture pursuant to the Marketing Order referred to above (Joint App. 123, 130). In March 1947 the producers terminated the order, and since that time the producer prices charged for the milk utilized in the various classes have been fixed by the appellant Association (Joint App. 122, 130). Milk products in Classes II and III compete in nationwide markets with such products produced outside the Washington area, and the prices for these products are, therefore, largely determined by competition (Joint App. 155, 179). Class I milk, however, is sold locally, and milk produced outside the area is not ordinarily sold here because local health regulations do not permit it. Since appellant Association controls 80% of the local milk supply, its Class I prices are not subject to competitive forces but are determined by the Association on the basis of producers costs and what the Association deems to be an appropriate profit (Joint App. 155, 179–180)."

5. The following is an excerpt from the testimony of Mr. Hooper, an official of the Association called as a witness by the government:

"Q. Just at that time the District of Columbia had already increased in population two or three times, hadn't it?

day, during a critical emergency, the Association spent $1,000 in telephoning all over the nation in an effort to find available milk, and lent its credit to the distributors in their purchases from distant suppliers to whom the distributors were unknown.

The inadequacy of the entire local supply—both that of the Association's members and that of independent producers—and the importation of milk by the distributors, continued without cessation to the date of the indictment. None of the effects of the conspiracy alleged in paragraph 36 of the indictment was proved.

The government did prove that the Association had once had a full supply contract, containing a classified use pricing arrangement, with each of the seven dairy defendants. But its contracts with Chestnut Farms, Thompson's and Wakefield, who together account for 72.7 per cent of the retail milk sales in the area, were terminated in 1938 and were not renewed. Since those three distributors, collectively dominant in the retail field, had not been proved guilty of any specific act charged in the indictment and had not been parties to full supply-classified use contracts with the Association during the three years next before the finding of the indictment—the period of limitation—Judge Holtzoff found them not guilty. Two other corporate defendants, Alexandria and Harvey, had been parties to full supply contracts embodying the classified use price system but were found not guilty: (a) Alexandria, apparently because its relations with the Association were governed by the Federal Marketing Order from February 1, 1940, until March 31, 1947, and thereafter by the orders of the Virginia Milk Commission; and (b) Harvey, apparently because it did no interstate business and did no business in the District of Columbia.

The evidence showed that Safeway had had a full supply-classified use contract with the Association since June 11, 1940, that Richfield had had such a contract since December 11, 1946, and that both remained in effect when the indictment was returned. There was no privity of contract between Safeway and Richfield at any time. Until March 31, 1947, when it was terminated, the Federal Marketing Order prescribed the classified use plan of pricing and so immunized Safeway, Richfield, Derrick and the Association from prosecution under the anti-trust laws for the use of that plan in connection with full supply contracts. So, when Judge Holtzoff found Safeway, Richfield and the Association guilty of conspiring to restrain trade because they employed the classified use plan in connection with full supply contracts, he necessarily based his finding upon the employment of that pricing plan during the period from March 31, 1947, when the Federal Marketing Order terminated, until March 8, 1948, the date of the indictment.

Derrick was also found guilty. The government points out that he signed the two

A. Yes, sir. It had increased tremendously.

"Q. And wasn't it a fact that you had to go outside the District of Columbia and purchase milk wherever you could get it in order to give the public milk? A. Yes, sir.

"Q. And isn't it a fact that the distributors themselves went outside the District of Columbia and bought milk wherever they could get it? A. Yes, sir.

"Q. And wasn't it a very serious problem during that time for the District of Columbia to get sufficient milk to give to the public of the District? A. It was very serious.

"Q. Do you recall on one day Mr. Derrick's spending over $1,000 on telephone calls to almost every milk shed in the United States, trying to get milk into the District? A. I remember Mr. Derrick spending the entire day on the telephone, calling all over the United States.

"Q. And, in that regard, when the public interest was thus affected, didn't the distributors also help out? A. Yes, sir.

"Q. Was there any talk then about full supply contracts to restrain trade? A. No, sir, there was not.

"Q. And how many years over this period was it that the distributors and your association were attempting to take care of public needs under this charge of a conspiracy? A. We were all working very desperately to secure enough milk for Washington from about the last of June, 1942, up to and beyond the date of this indictment. '

contracts for the Association. That fact alone cannot sustain his conviction because the contracts were admittedly legal under the Federal Marketing Order, which was in effect when they were signed. But the government says in its brief, " * * * He called meetings of the distributors and presided at them, he signed letters to the distributors from the Association, and he conferred with the distributors on a wide range of matters, involving the marketing of milk in the Washington area." Those activities, however, were entirely legal and did not amount to participation in a conspiracy. Derrick should have been acquitted.

We are thus brought to a consideration of the question whether the three convicted corporations, by means of full supply contracts covering 13.8 per cent of the milk sales in the area and by means of a utilization-classification system of pricing have unlawfully created, as the government puts it, "a rigid and artificial pricing structure in the sale of fluid milk without regard for the normal forces of competition * * *."

Section 3 of the Sherman Act denounces as illegal "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in * * * the District of Columbia." The indictment charges a conspiracy. If there was a conspiracy at all, there were two conspiracies here, for there was no proof of agreement or concerted action between Richfield and Safeway. The proof wholly failed as to actual restraint of trade as a result of operations under either of the contracts. So, as the District Court's opinion shows, the convictions were based solely upon the contract between the Association and Richfield, and upon the contract between the Association and Safeway, which were held to be sources from which it was possible that restraint of trade might flow. No individual act of the Association, however unlawful, can justify the conviction of the three defendants under the conspiracy charge.

Having in mind what has just been said, we proceed to discuss the rights of the Association under the law, and the anti-trust boundary beyond which it and its distributors may not lawfully go in their contractual arrangements. The Supreme Court has clearly marked the boundary:

The Court pointed out in United States v. Borden Company, 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181, that § 6 of the Clayton Act authorized the formation and operation of non-profit agricultural organizations, without capital stock; and provided that the anti-trust laws shall not be construed to forbid members of such associations "from lawfully carrying out the legitimate objects thereof." They were not to be held illegal combinations.

The Supreme Court also said the Capper-Volstead Act was made applicable as well to co-operatives having capital stock. The persons to whom that act applies are defined in § 1 as producers of agricultural products, "as farmers, planters, ranchmen, dairymen, nut or fruit growers". They are authorized to act together in "collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their products. They may have "marketing agencies in common," and they may make "the necessary contracts and agreements to effect such purposes."

After summarizing, substantially as we have done, the activities in which a co-operative may engage with immunity from anti-trust prosecution, the Supreme Court proceeded to evaluate the conspiracy indictment which was before it in the Borden case, and said, 308 U.S. at pages 204 and 205, 60 S.Ct. at page 191, 84 L.Ed. 181:

"The right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise. In this instance, the conspiracy charged is not that of merely forming a collective association of producers to market their products but a conspiracy, or conspiracies, with major distributors and their allied groups, with labor officials, municipal officials, and others, in order to maintain artificial and non-competitive prices to be paid to all producers for all fluid milk produced in Illinois

and neighboring States and marketed in the Chicago area, and thus in effect, as the indictment is construed by the court below, 'to compel independent distributors to exact a like price from their customers' and also to control 'the supply of fluid milk permitted to be brought to Chicago.' 28 F.Supp. 180–182. Such a combined attempt of all the defendants, producers, distributors and their allies, to control the market finds no justification in § 1 of the Capper-Volstead Act."

In harmony with these holdings, this court said on the first appeal of the present case:[6] " * * * 'full supply contracts', however legal they may be in other circumstances * * * are illegal when made for the purpose of eliminating and suppressing competition. Complete monopoly is of course unnecessary; * * *" and later added, 85 U.S.App.D.C. at page 182, 179 F. 2d at page 428: "Although the Capper-Volstead Act, 42 Stat. 388, 7 U.S.C.A. § 291, and the Clayton Act, 38 Stat. 730, 731, 15 U.S.C.A. § 17, give some privileges to combinations of agricultural producers, a combination of producers and distributors to eliminate competition and fix prices at successive stages in the marketing of an agricultural product is not privileged."

Both the Borden case and the first appeal of this case had to do with the sufficiency of an indictment. Neither dealt with an actual situation presented by proof. We draw from our former opinion in this case the principle that "full supply contracts" are illegal when made for the purpose of eliminating and suppressing competition; and that a combination of producers and distributors to eliminate competition and fix prices at successive stages in the marketing of milk is also illegal.

This record is barren of proof that the full supply contracts between the Association and the two convicted distributors were made for the purpose of eliminating and suppressing competition. The only evidence on the subject is to the effect that they were not made for that purpose and did not produce that result. We have already shown that neither wholesale nor retail prices were fixed by joint action of the alleged conspirators.

The District Court was of the opinion[7] " * * * that 'full supply' contracts which embodied the classification plan for arriving at the price of milk constituted, in effect, agreements to fix prices. It is well settled that an agreement to fix prices of a commodity is *per se* an unreasonable restraint of trade and, therefore, a violation of the Sherman Act. * * *

"The conclusion is inescapable that there is substantial evidence justifying a finding that the operation of the 'full supply' contracts embodying the classification plan constituted a scheme for controlling and fixing prices of milk sold by the Association to the distributors, and, therefore, is an illegal restraint of trade in contravention of Section 3 of the Sherman Act."

We have found no evidence at all in the record which would justify the finding to which the District Court referred. The only evidence on the subject is contrary to such a finding. But if there were substantial evidence tending to show a classified use-full supply contract is "a scheme for controlling and fixing prices of milk sold by the Association to the distributors," such evidence would not justify the trial court in holding the appellants guilty, unless it showed guilt beyond a reasonable doubt.

Judge Holtzoff also concluded that, because the Agricultural Marketing Act authorizes marketing agreements and the use of the classification plan and exempts them from anti-trust laws, provided the parties submit to supervision and regulation by the Secretary of Agriculture, it must follow that a marketing agreement which uses the classification plan is *per se* a violation of the Sherman Act if it is not a Federal Marketing Order under which the Secretary of Agriculture has supervisory and regulatory power. We do not agree.

When Congress enacted the Agricultural Marketing Act, it did not devise the classification use plan as an original proposition;

---

6. United States v. Maryland and Va. Milk Producers Ass'n, 1949, 85 U.S.App. D.C. 180, 182, 179 F.2d 426, 428.

7. United States v. Maryland and Va. Milk Producers Ass'n, D.C.1950, 90 F.Supp. 681, 689.

rather, it adopted that plan, which had been used in the industry since 1916. In the language of Judge Holtzoff, it "is generally regarded as economically sound because of the unique and exceptional features of the industry." Full supply contracts embodying the classified use pricing scheme are not in themselves illegal unless they are made for the purpose of eliminating and suppressing competition or unless they tend to have that effect. A full supply contract containing the classification plan for arriving at the price of milk is, in a sense, an agreement to fix the price of milk; but only in the same sense that a sales contract for a flat price is an agreement to fix prices. For such a contract to be illegal *per se* it must be demonstrable that it gives to the contracting parties power which may be wielded to the disadvantage and detriment of the public and which may become oppressive as against competitors and tyrannical as against consumers.

Had Congress intended to forbid the use of the classification pricing plan except under a Federal Marketing Order, doubtless it would have so provided. But it did not. Nor is a co-operative compelled to operate under a Federal Marketing Order. Its free assent to such an Order is required to make it effective, but the District Court's construction of the Act practically destroys that freedom.

It should be noted also that the purpose of the Act was not to forbid the use of classification pricing, but to permit the making of marketing agreements under the Secretary's supervision which otherwise would unlawfully restrain trade. Therefore, any marketing agreement outside the Federal Order must unlawfully restrain trade if the parties to the agreement are to be held guilty of violating the Act.

The case was well summarized by Judge Holtzoff when he wrote, 90 F.Supp. at 689: "In justice to all, it should be observed that there is no evidence that any of the defendants acted in bad faith or that any of the defendants was actuated by any malevolent motive or pursued an evil design, or that any defendant engaged in any unethical practice, or in any manner oppressed either any competitor or the public. Moreover, there is no evidence that the prices fixed were unreasonable or that either the competitors or the consuming public were in any way actually harmed or prejudiced. There is an honest difference of opinion between the Government and some of the defendants as to whether the course of conduct just described was permitted by law. This question could well have been settled by a civil action without a criminal prosecution with all its implications." It follows that there is "an honest difference of opinion" as to whether the full supply-classified use contracts "have created a rigid and artificial pricing structure in the sale of fluid milk without regard for the normal forces of competition."

The testimony of expert witnesses was to the effect, not only that the classified use pricing system is economically sound, but that in practice it is responsive to competition and levels off to the same result in money as does the flat price. The term "blend price" is sometimes applied to the flat price because it is and necessarily must be a blend or average of all the prices set under a classified use plan; but the latter has the added advantage of automatically caring for the surplus milk which develops from day to day. There was no expert evidence to the opposite effect.

The result of all this is that the District Court used as a basis for conviction, and the government urges here as a basis for sustaining it, an economic theory about which there are two opinions supportable by plausible argument. In advancing the theory the government's brief makes statements such as these:

"The classified-use plan, as employed by appellants, unlawfully restrains trade.

"The classified-use plan restrains competition at the retail level.

"The classified-use plan also tends to regulate the price relationships among the classes of milk products sold in the retail market. * * * the classified-use plan tends to establish minimum differentials between the retail prices."

These statements are conclusions which find no support in the evidence concerning the factual situation nor in the testimony

of the experts. They are no more than statements of economic theory ably advocated by the appellee.

 But the trouble is that, as plausible as the government's economic theory is, it is not enough to sustain these convictions. It must appear beyond a reasonable doubt that these three corporations were guilty as charged, or their convictions cannot stand. In pronouncing them guilty, the court was relying on the economic hypothesis that full supply-classified use contracts tend unlawfully to fix prices and to restrain trade. There was no expert evidence to support the hypothesis and, had there been, it would not have supported a finding of guilt. It is still the law that there can be no conviction of crime on circumstantial evidence unless the only possible inference to be derived from it is that of guilt. There must be evidence which forecloses and makes impossible any other conclusion. Pennsylvania Railroad Company v. Chamberlain, 1933, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Hammond v. United States, 1942, 75 U.S.App.D.C. 395, 397, 127 F.2d 752; Cady v. United States, 1923, 54 App. D.C. 10, 293 F. 829; Isbell v. United States, 8 Cir., 1915, 227 F. 788. It is equally true that guilt cannot be inferred from an unsupported economic theory.

We hold that the government's theory does not show beyond peradventure that the full supply-classified use contracts in this case gave their makers the power to do the mischief which the indictment alleges.

 After the appeals of Richfield and Safeway had been docketed in this court, and prior to argument, those companies and the government filed with the clerk of this court an agreement in writing directing the appeals to be dismissed under our Rule 21. As a result of this action, we cannot disturb the convictions of Richfield and Safeway. But on the appeals of the Association and Derrick, the orders of the District Court finding them guilty and imposing fines are reversed with instructions to the District Court to find them not guilty.

Reversed.

FAHY, Circuit Judge (dissenting).

The appeals for decision are now confined to those of the Association and its Secretary-Treasurer. Of the original defendants three distributing companies were acquitted by the court at the completion of the Government's case, two others after completion of the whole trial, and two were convicted along with the Association and its Secretary-Treasurer. The two convicted distributors after appealing paid their fines and dismissed their appeals.

The Association, a corporation composed of approximately fifteen hundred dairy farmers, referred to as producers, supplies approximately 80% of the milk sold in the Washington area. The combining of these producers with one another in an Association and the pooling of their milk for sale to distributors, with consequent stronger bargaining position and other advantages, is not questioned. Such agreements as are incident to this arrangement are protected from the anti-trust laws by Congressional enactment. 42 Stat. 388 (1922), 7 U.S.C.A. §§ 291, 292 (1946) (Capper-Volstead Act); 38 Stat. 731 (1914), 15 U.S.C.A. § 17 (1946) (Clayton Act). United States v. Borden Co., 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

The two distributors found guilty of violating Section 3 of the Sherman Act (26 Stat. 209 (1890), 15 U.S.C.A. § 3 (1946)) during a test period accounted for an aggregate of 13.8 per cent (one for 12.3 per cent and the other for 1.5 per cent) of Class I and Class II milk sold in the Washington area. By contract they obtained their full supply from the Association to the extent it could meet their requirements.

The case turns upon the arrangements between the Association and these distributors, and of the latter among themselves, consisting primarily of full supply contracts which embody a use classification plan.[1] The District Court, Judge Holtzoff sitting, was of the opinion that these contracts constituted agreements for controlling and fixing prices of milk sold by the Association to the distributors, and, therefore, re-

---

1. At the time of indictment such contracts were also in effect between the Association and distributors who, with the two convicted, accounted for about 22% of the milk and its products sold in the Washington area.

strained trade and commerce in violation of Section 3 of the Sherman Act.

This conclusion of the trial judge appears to me to be correct. As stated, the distributors are required to obtain their full supply from the Association to the extent it is able to meet their requirements. The Association carries out this obligation by assigning the milk supply of certain member producers to certain distributors. The latter sell the milk for uses which are divided for pricing purposes into three classes. The most important of these classes consists of the use of milk for consumption in fluid form. This is Class I. Milk so used is ordinarily sold in bottles or cartons for direct consumption, though it may be sold in bulk. Milk used or sold by the distributor for conversion into cream or cottage cheese is in Class II, and that used or sold by the distributor for manufacturing products such as ice cream is in Class III. These classifications have nothing whatever to do with the quality of the milk. The classifications are entirely upon the basis of use and are for pricing purposes. For Class I milk the distributor pays the Association a higher price than is charged by the Association for Class II or Class III milk. The price charged for Class III is either less than that for Class II or is the same. Since the distributor does not know when he receives the milk from the Association how much of it he will sell or use in each class, the amount he pays the Association is computed by an audit made after disposition or use.

There are other details of the arrangements which might aid in stabilizing the market, in keeping a steady supply to meet the essential needs of the consuming public, and at the same time in avoiding the economic distresses consequent upon a surplus. But the essential features of the arrangements are those above outlined.

Pricing according to use is the principal feature of the use classification plan. During the relevant period this plan was in effect between the Association and distributors and among the latter.[2] The inevitable effect is to bring about and to maintain a price differential based on use. A higher price is paid by the distributor for milk used to fill the more vital need of the public for nutrition and health purposes (Class I). In this manner the Association and distributors engage in price fixing, although the actual prices for the several classes are fixed by the Association alone. This court so held, as I read the opinion, in United States v. Maryland & Virginia Milk Producers Ass'n, 1949, 85 U.S.App.D.C. 180, 183, 179 F.2d 426, 429, certiorari denied, 1949, 338 U.S. 831, 70 S.Ct. 72, 94 L.Ed. 506, when the case was here on appeal from dismissal of the indictment. There is concert between the Association and distributors and among the latter as a result of which the price for Class I milk is higher than the price charged for like milk used for other purposes. As the District Court held, this in effect is price fixing, and, therefore, is a combination or conspiracy in restraint of trade in violation of Section 3 of the Sherman Act, United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Real Estate Boards, 1950, 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007, unless relieved of this consequence by approval of such arrangements under some valid law, such as the Agricultural Marketing Agreement Act of 1937 (48 Stat. 31 (1933), as amended, 50 Stat. 246 (1937), 7 U.S.C.A. § 601 (1946); 48 Stat. 34 (1933), as amended, 7 U.S.C.A. § 608b (1946)). See United States v. Borden Co., 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181, and United States v. Maryland & Virginia Milk Producers Ass'n, supra. The arrangements here involved were in fact at one time approved by the Secretary of Agriculture under the provisions of that Act. Congress recognized the need in the public interest of permitting the orderly marketing of milk through ar-

---

2. Thus, the Richfield contract, used to illustrate, provided that in the event the Marketing Agreement and Order approved by the Secretary of Agriculture is terminated and not immediately replaced, a situation which actually arose, "the price to be paid and settlement ar-

rangements for milk, cream, and/or other dairy products sold and delivered hereunder shall be that price charged and arrangements in effect with all full-supply distributors buying District of Columbia or Maryland-inspected milk."

rangements or agreements or combinations which would run counter to the policy of the anti-trust laws, provided such arrangements were subjected to public controls set forth in the statute. The Association and distributors in the Washington area brought themselves within this legislation by obtaining governmental approval of the use classification plan in 1940. In 1947, however, they voluntarily withdrew, as was their right, because of dissatisfaction with the controls, including those involving price. The conduct now in question then became subject to the standards of the Sherman Act. United States v. Borden Co., supra.[3]

In our recent decision in Pennsylvania Water & Power Company, et al. v. Federal Power Commission, 89 U.S.App.D.C. ——, 193 F.2d 230, decided July 3, 1951, we dealt with the power of the Commission, acting within the policy and provisions of the Federal Power Act, 16 U.S.C.A. § 791a et seq., to require the continuance of arrangements which, without the sanction of valid public authority, would violate the anti-trust laws. So here, the conflicting public policies embodied in the Sherman Act, on the one hand, and, on the other, in the desire of Congress to aid in stabilizing the milk industry, are reconciled in the Agricultural Marketing Agreement Act; but when the Association and distributors chose to remain no longer subject to the controls therein specified, the arrangements which continued into the period covered by the indictment became exposed to the Sherman Act.

Price fixing is illegal *per se* because its necessary effect is to restrain trade or commerce by substituting agreement upon price for competition and economic factors such as supply and demand. In the case at bar it might well be that economic reasons would cause milk consumed in fluid form to bear a higher price than like milk used for other purposes; it is shorter-lived and there may be greater expense and risk in handling it for such consumption than for conversion into cheese, for example. Nevertheless, in the absence of approval under the 1937 Act, supra, agreement among competing distributors and between them and their supplier to a plan which maintains such higher price is invalid. Though the actual price and the exact amount of differential between classes at any particular time are not shown to have been set by agreement or in an unlawful manner, the existence of a differential based on use, with a higher price for Class I use, is the intended and necessary consequence of the plan. Furthermore, its necessary effect is to enlarge the area within which Classes II and III may compete by lowering the cost to the distributor of this milk and shifting a larger share of the total cost to Class I. This also restricts the competitive potential of Class I, a result made more certain by the control the Association exerts over 80% of the supply in the Washington area. A higher price accordingly is attached to the milk required to meet the most important need of the public.

In view of the foregoing it is not deemed necessary to discuss the question whether the full supply contracts, apart from the use classification plan, violate the Sherman Act. International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Fashion Guild v. Trade Comm., 1941, 312 U.S. 457, 61 S.Ct. 703, 668, 85 L.Ed. 949; and Standard Oil Co. v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. See, also, United States v. Maryland & Virginia Milk Producers Ass'n, supra, 85 U.S.App.D.C. at page 182, 179 F.2d at page 428.

3. There is another factor bearing directly upon price. Should a distributor dealing principally with the Association purchase milk from a producer not a member of the Association, as is sometimes done, this milk, however used by the distributor, and though of equal quality to that supplied by the Association, is classified by the Association in the audit as in the lowest use class, regardless of the price paid for it by the distributor, unless there is an insufficient supply from the Association for Classes I and II. The Association is accordingly paid the higher use price (merely because some milk is obtained from a source other than the Association) though the milk supplied by the independent might have displaced Association milk for Class I use.

The individual appellant was an active officer of the Association during the period to which the trial court limited the scope of the indictment. In addition to such inferences as might properly be drawn from the duties of his position as Secretary-Treasurer, considered in connection with the operations of the use classification plan, it is clear that this plan continued into the relevant period under contracts which, prior thereto, he had executed as Secretary-Treasurer. His authorization of such operations, therefore, did not cease with termination of the Marketing Agreement and Order in 1947. His conviction I think was accordingly justified in view of the statutory provisions that whenever a corporation shall violate any of the penal provisions of the anti-trust laws, such violation shall be deemed to be that also of the individual officers who shall have authorized or done any of the acts constituting in whole or in part such violation, which shall be deemed a misdemeanor. (38 Stat. 736 (1914), 15 U.S.C.A. § 24 (1946)). See United States v. Dotterweich, 1943, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48.

I would affirm the judgments of the District Court.