529 F.Supp. 1326 (1982)
In re MIDWEST MILK MONOPOLIZATION LITIGATION.
STATE OF ILLINOIS, et al., Plaintiffs,
v.
AMPI, et al., Defendants.
and
SENTRY FOOD STORES, INC., Plaintiff,
v.
AMPI, et al., Defendants.
MDL Docket No. 83, Nos. 73 CV 78-W-1, 73 CV 80-W-1.
United States District Court, W. D. Missouri, W. D.
January 13, 1982.
*1327 Thomas S. Malciauskas, Asst. Atty. Gen., State of Ill., Chicago, Ill., for the State of Ill.
Marshall Patner, Pressman & Hartunian, Chtd., Chicago, Ill., for Sentry.
Richard K. Decker, Michael P. Comiskey, Lord, Bissell & Brook, Kael Kennedy, Katten, Muchin, Gitles, Zavis, Pearl & Galler, Chicago, Ill., William A. Carey, Barnett, Alagia & Carey, Washington, D. C., Sydney Berde, St. Paul, Minn., for defendants.

MEMORANDUM AND ORDERS GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING STATE OF ILLINOIS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT
JOHN W. OLIVER, Senior District Judge.
Both of the above cases pend on defendants' Associated Milk Producers, Inc. (AMPI), Associated Reserve Standby Pool Cooperative (ARSPC), Associated Milk Dealers, Inc. (AMDI), Central Milk Producers Cooperative (CMPC), and Central Milk Sales Agency (CMPA) motions for partial summary judgment. Those motions seek judgment in favor of the defendants in regard to the claims of each plaintiff for damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. Also pending is the State of Illinois' motion for leave to file another amended complaint, ruling of which was deferred for reasons stated in our May 6, 1981 memorandum and order.
Defendants' motions for partial summary judgment will be granted in each case. The State of Illinois' motion for leave to file another amended complaint in its case will be denied.

*1328 I. Undisputed Factual Circumstances Which Are Material to the State of Illinois Case

A.
Defendants set forth twenty-four factual circumstances which they contend are the material facts in regard to which there is no genuine issue within the meaning of Rule 56 and upon which they argue that the pending motion in the State of Illinois case should be granted. Defendants' twenty-four paragraphs are based on allegations in the State's first amended and supplemental complaint, on the express stipulations of the parties, and on factual data contained in two affidavits which are cited to support only four of defendants' twenty-four paragraphs.
It should be noted at the outset that the State did not even attempt to controvert any of the factual data contained in the two affidavits filed by the defendants. Nor has the State filed any counter-affidavits, as mandated by Rule 56(e). And the State has not otherwise attempted to set forth specific facts which would attempt to show that a genuine issue was presented for trial in regard to the factual data stated in the two affidavits filed by the defendants. It cannot, of course, contend that the factual data agreed to in the stipulation is in dispute.
The principles stated and applied in First Nat. Bank v. Cities Service, 391 U.S. 253 at 288, 88 S.Ct. 1575 at 1592, 20 L.Ed.2d 569 (1968) (in which Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1968), relied upon by the State, was distinguished), in Willmar Poultry Co. v. Morton-Norwich Products, Inc., 520 F.2d 289 at 293 (8th Cir. 1975), cert. denied, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976), and in Beckers v. Intern. Snowmobile Industry Assn., 581 F.2d 1308 at 1311 (8th Cir. 1978), establish that the factual data set forth by defendants, including but not limited to that contained in the two affidavits filed by the defendants, may not properly be considered to be in factual dispute.
The State does not really suggest that any of the facts upon which defendants rely are in dispute. Rather, the State argues that the defendants' interpretation of Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) "is erroneous" and that, "perforce defendants' statement of material facts is conclusive of nothing." The State accordingly submitted eight factual circumstances which it contends are material and are "facts" which present genuine issues for trial.
Defendants, as would be expected, contend that the eight "facts" set forth by the State do not present a "genuine issue of a material fact" within the meaning of Rule 56, and that the pending motion for partial summary judgment is in a proper posture to be ruled. We agree.
We are satisfied that the defendants' interpretation of Hanover Shoe and Illinois Brick is not erroneous. In light of our agreement with the defendants' interpretation of those cases, we also agree that the twenty-four factual circumstances set forth by defendants are the material facts to be considered in ruling the pending motion in that case and that the eight "facts" set forth by the State do not present any genuine issue as to any material fact within the meaning of Rule 56, which precludes the granting of defendants' pending motion for partial summary judgment.
We shall therefore set forth as our findings of fact all twenty-four paragraphs of defendants' statement of material facts. We shall then outline our view in regard to why the eight "facts" stated by the State are neither material nor in genuine issue within the meaning of Rule 56.

B.
The following facts are material and not in dispute:
1. Plaintiff is the State of Illinois and its several departments, agencies and political subdivisions. The State is suing on behalf of an assorted class of municipalities, public institutions, and school districts. Stip. ¶ 1.
*1329 2. The State of Illinois, its departments, agencies and political subdivisions, complain that the defendants and co-conspirators have unlawfully combined and conspired to restrain and monopolize trade and commerce in raw milk supplied to the Chicago Regional Marketing Area by entering into agreement to:
(a) raise, fix and stabilize the price of raw milk in the Chicago Regional Marketing Area;
(b) raise, fix and stabilize the handling and/or service charges applicable to raw milk in the Chicago Regional Marketing Area;
(c) control the supply of raw milk in the Chicago Regional Marketing Area;
(d) maintain control over and to divert to other markets and uses alternative supplies of raw milk from areas outside of the Chicago Regional Marketing Area;
(e) exclude from competition all other persons desiring to engage in the production and sale of raw milk in the Chicago Regional Marketing Area; and
(f) divide and allocate among themselves certain customers and classes of customers for raw milk. Stip. ¶ 2.
3. The State of Illinois, its departments, agencies and political subdivisions claim that defendants' unlawful conduct has:
(a) denied the plaintiff the benefits of unrestricted competition in the production of raw milk which benefits, but for the alleged violations of the antitrust laws, would be passed on directly to plaintiff and members of the class in the form of lower prices for fluid milk products; Complaint ¶ 23(a).
(b) compelled plaintiffs to pay substantially higher prices for fluid milk products purchased by them within the Chicago Regional Marketing Area, such higher prices being directly traceable, both in origin and amount, to the violations of the antitrust laws which they allege. Stip. ¶ 3, Complaint ¶ 23(b).
4. The term "raw milk" means the milk of cows prior to pasteurization and "fluid milk product" means "all milk or milk products sold or disposed of by dealers in fluid form." Complaint ¶ 12.
5. Plaintiff alleges that "co-conspirators" as hereinafter referred to in this Stipulation shall include but is not limited to members of defendant AMDI. Stip. ¶ 4.
6. Prior to April, 1979 Associated Milk Dealers, Inc. (AMDI) was an incorporated trade association of ten of the approximately 98 milk processors which at that time sold fluid milk product and other processed milk products in the Chicago Regional Marketing Area, U.S.D.A. Order No. 30. Since April, 1979 and at the present time, AMDI is an unincorporated association of eight milk dealers who process raw milk and distribute fluid milk product and other processed milk products in the Chicago metropolitan area and in other parts of Illinois. Stip. ¶ 5.
7. AMDI neither buys nor sells milk in any form. Stip. ¶ 6.
8. Certain AMDI members who are alleged by plaintiff to be co-conspirators have supplied fluid milk products and other processed milk products to the State of Illinois, its departments, political subdivisions and members of the asserted class. Stip. ¶ 8.
9. Central Milk Producers Cooperative (CMPC) is a federated association of milk marketing cooperatives organized in 1968 whose members market raw milk in the Chicago Regional Marketing Area, Order No. 30. Stip. ¶ 9.
10. Prior to 1975 AMDI's members purchased approximately 90% of their raw milk used for Class I purposes from members of CMPC. Stip. ¶ 10.
11. Associated Milk Producers, Inc. (AMPI) is a cooperative association of dairy farmers engaged in the marketing of raw milk in the Chicago Regional Marketing Area, Order No. 30. Stip. ¶ 11.
12. Central Milk Sales Agency (CMSA) was organized on July 1, 1967 as an unincorporated joint milk marketing federation of agricultural cooperative associations or producers who market raw milk to handlers regulated under Order No. 30. Stip. ¶ 12.
13. In April of 1970 defendant Associated Reserve Standby Pool Cooperative *1330 (ARSPC) was incorporated in the State of Nebraska as a federated agricultural cooperative association of producers for the purpose, among others, of operating a standby pool. Stip. ¶ 15.
14. Neither the State of Illinois nor any of its departments, agencies or political subdivisions has ever purchased any raw milk, fluid milk product or other processed milk products from any of the defendants. Stip. ¶ 24.
15. During all times relevant to the complaint herein, the State of Illinois, its departments, agencies or political subdivisions have purchased fluid milk products and other processed milk products in Illinois from persons engaged in the processing of raw milk, including alleged co-conspirators. Stip. ¶ 23.
16. Almost all milk or milk products purchased by the State of Illinois, its departments, agencies or political subdivisions are purchased on the basis of bids submitted by a milk processor or vendor. Stip. ¶ 25.
17. Neither AMPI, CMPC, CMSA nor ARSPC has ever owned, controlled or had the right to exercise supervisory authority over management decisions of AMDI or its members. Stip. ¶ 22.
18. Increases in a milk processor's cost of raw milk ultimately work their way down to end-users in the marketplace although there is sometimes a lag in the increase of fluid milk product prices which results from increases in raw milk prices. Stip. ¶ 32.
19. The extent to which increases in raw milk cost may result in increases in the price of processed milk products depends upon economic variables including but not limited to competition, excess plant capacity, cost of other raw materials, labor, packaging, energy, delivery, location of buyer with reference to the processor, and volume of purchases. Rittmueller Affid. ¶ 10, Ex. D.
20. Milk processors in the Chicago metropolitan area incur a number of costs in connection with their raw milk supply in addition to the raw milk prices announced by CMPC, or other cooperatives. These costs, which vary among milk processors, include "plant premiums" paid directly to producers, "producer hauling subsidies," expenses of field services, bulk milk hauling, and receiving costs. Rittmueller Affid. ¶ 7, Ex. D.
21. The terms of bid contracts for fluid milk and milk products between milk processors and the State of Illinois public institutions do not obligate the State to buy or the processor to deliver any fixed quantities of fluid milk product or other processed milk products. Hansen Affid. ¶ 6, Ex. C.
22. Neither the State of Illinois nor any of its departments, agencies or political subdivisions has ever been a party to preexisting "cost plus" contract based upon the cost of raw milk. Rittmueller Affid. ¶ 9, Ex. D; Hansen Affid. ¶ 6, Ex. C.
23. The following is a brief general description of the steps taken by a processor in converting raw milk into typical fluid milk products:
(a) 3.25% Homogenized Milk: Grade A milk from the cow is received for processing at distributing plants directly from the farm or from supply plants. It is weighed, sampled and pumped into storage tanks where it is cooled to about 40 degrees Fahrenheit, tested for butterfat, and standardized at the processing plant to the desired butterfat level. Impurities in the raw milk are removed by a "clarifier," which consists of a set of discs revolving at 5,550 r.p.m.
(b) The milk is then pasteurized by maintaining it at a heat of either 145 degrees for at least 30 minutes (the old method) or over 161 degrees for over 15 seconds (the "High Temperature Short Time" (H.T.S.T.) method). In the H.T. S.T. method, the milk is drawn through the regenerating section of the H.T.S.T., and goes through the homogenizer, a machine composed of pistons which force the milk through a grid to break up the fat globules into tiny particles so that they are evenly dispersed throughout every drop of milk.

*1331 In the larger H.T.S.T. units, the milk is completely under pressure through the system with a lower pressure being maintained in the regenerative section of the H.T.S.T. The milk is then heated to the proper temperature, held the proper time and cooled to approximately 38 degrees for packaging.
(c) Other Fluid Milk Products: Milk destined for all fluid milk products other than 3.25% homogenized is made up in separate vats, all ingredients added, and then put through the H.T.S.T. First, the milk passes to the separator where it is divided into skim and cream and stored. For chocolate milk, flavorings and sugar are added; for nonfat chocolate milk, a stabilizer is normally added. For Vitamin D milk, vitamins are added; for fortified milk, various fortification agents are added. Then comes the H.T.S.T. and the homogenizer. The milk is then packaged by various types of packaging devices and stored in coolers ready to be loaded for distribution.
24. Raw milk accounts for approximately 45 to 60 percent of the total costs incurred by milk processors in processing, packaging and delivering fluid milk and milk products to buyers. Processing, packaging and delivery costs vary among the several milk products depending upon the amount of processing required and the cost of packaging and delivery of each product. The milk processor's costs include, in addition to raw milk cost, in-plant processing (labor, materials, ingredients), packaging (containers), operating supplies, rent, depreciation, energy, taxes, insurance, advertising and general administration. Rittmueller Affid. ¶ 11, Ex. D.

C.
The eight "facts" which the State contends are material and in dispute under what the State contends is a "proper analysis of Illinois Brick" are as follows:
1. The Superpool program, including pricing in effect in the Chicago market, was negotiated between representatives of CMPC and AMDI in much the same manner as labor union negotiations normally take place between representatives of management and labor.
2. In the course of such negotiations (see Par. 1, supra), the Producer Relations Committee of AMDI acts as agent for and negotiates on behalf of the processor-members of AMDI with producer cooperatives in the development of the terms of Superpool including increases in the price of raw milk, the timing of such increases, the ability of plaintiff and members of the class to absorb such increases, the bracket system, the terms of delivery and other terms of sale.
3. The bracket system was incorporated into the Superpool program by agreement between AMDI and CMPC in order that the co-conspirator members of AMDI and others would increase by one-half (½) or one (1) cent per quart the price of processed and packaged milk sold by them to plaintiff and members of the class.
4. Under the terms of Superpool, raw milk sold to processors, which is processed and disposed of as fluid milk product and other processed milk products to institutions such as plaintiff and members of the class, has at times been priced differently than raw milk sold for processing and disposition as fluid milk product and other processed milk products to end-users generally. (Exhibit "I"; Stip. ¶ 29). The particular arrangements concerning sales to institutional end-users were developed in the course of negotiations between the Producer Relations Committee of AMDI and representatives of CMPC.
5. The Board of Education of the City of Chicago, a member of the proposed class, has used contracts for milk and milk products with a cost-escalator clause which permits processors to raise their price for fluid milk product and other processed milk products in amounts which reflect increases in the federal order price plus the Class I premium the bidder must pay as published by CMPC, said premium not to exceed thirty cents ($.30) per cwt.
6. The net effect of the Superpool program as it applies to institutional end-users *1332 is that to the maximum extent possible, the impact of increases in the price of raw milk negotiated between the cooperatives and AMDI will be felt by the institutions and not by the processors.
7. The cooperative interests have in some instances attempted to assist the processor-members of AMDI in raising the price of fluid milk in response to increases in the Superpool price.
8. Raw milk is essentially the same commodity as fluid milk product. Fluid milk is exactly convertible into its raw milk equivalent (pounds).
The data cited and contained in the various exhibits attached to the State's memorandum in opposition to defendants' pending motion for partial summary judgment have been considered as though it had properly been submitted by affidavit as contemplated by Rule 56(e). Careful examination of all the data cited under each of the eight "facts" establishes, however, that the most that can be said is that the State may have raised a few factual issues in regard to facts which, in our judgment, are not material under the interpretation we believe we are required to give Illinois Brick.
In addition, it is quite clear that the data cited to support the State's assertions in "facts" Nos. 1 and 2 to the effect that AMDI allegedly acted as "agent ... for the processor members of AMDI" and that CMPC "negotiated" with it to establish the price and other terms of sale of raw milk completely fail to do so. The State's citation of page 443 of our findings in In re Midwest Milk Monopolization Litigation, 510 F.Supp. 381 (W.D. of Mo.1981), for example, refers to findings made in regard to organizations of milk "producers" and milk "cooperatives"  not organizations of milk "handlers." There is no suggestion in any of the findings on page 443 of 510 F.Supp. which would even tend to support either No. 1 or No. 2 of the State's "facts."
Indeed, the specific findings made in regard to AMDI as they appear on page 477 of 510 F.Supp., particularly when those findings are considered in light of the proposed findings which we expressly rejected, establish only that "after CMPC's formation, the Price Development Committee of CMPC and AMDI's Producer Relations Committee met from time to time" (Finding No. 1159). Finding No. 1161 shows that "CMPC published monthly price announcements reflecting superpool prices established by CMPC." 510 F.Supp. at 477. That finding, when considered in light of the proposed findings which were rejected, and read in context of all other findings, reflected our view that CMPC had acted alone in its publication of price announcements. The mere holding of meetings, and even discussions of the prices to be imposed, or which may have been imposed, at such meetings do not violate the antitrust laws. United States v. Maryland & Virginia Milk Producers Ass'n., 90 F.Supp. 681 at 685-86 (D.D.C.1951), rev'd. on other grounds, 193 F.2d 907 (D.C.Cir.1951).
The State's "facts" Nos. 3 to 6 apparently attempt to state circumstances which would support a "functional equivalent" of a true cost-plus contract which would, in turn, qualify as an exception to the rule of Illinois Brick. Our agreement with the Third Circuit's opinion in Midwest Paper Products Co. v. Continental Group, 596 F.2d 573 (3rd Cir. 1979) in regard to that legal question necessarily means that "facts" which relate to the amount of only some of the over-charges which are "passed-on" by a direct purchaser simply are not material in a case where there is no dispute about the fact that no pre-existing, fixed-quantity, cost-plus contracts were ever in existence between the direct purchasers from the named defendants in the case and the plaintiffs. (Our use of the words "named defendants in the case" in the preceding sentence reflects our agreement with that portion of In re Beef Industry Antitrust Litigation, 600 F.2d 1148 at 1163 (5th Cir. 1979), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 281, 66 L.Ed.2d 137 (1980), which holds that a "co-conspirator" exception to Illinois Brick is not available in a case in which a plaintiff has failed to name the alleged co-conspirator middlemen as parties defendant.)
*1333 We further find that the data cited in support of "facts" Nos. 3 to 6, inclusive, do not support the statements contained therein and that such data do not present a genuine issue in regard to a material fact within the meaning of Rule 56.
The data cited by the State in support of its "facts" Nos. 7 and 8 fail to support those statements. And, as is true in regard to all the other "facts" stated by the State, the most that can be said about "facts" Nos. 7 and 8 is that the data cited can be said only to support a factual dispute about an immaterial, rather than a material, fact.

II. Undisputed Facts Which Are Material to Sentry Case

A.
Defendants set forth 46 facts in the Sentry case which they contend are material and which they argue support the granting of partial summary judgment in that case. All except three of those facts are stipulated by the parties. The three not stipulated are based on the same two affidavits filed by the defendants pursuant to Rule 56.
As is true of plaintiff State in the State of Illinois case, plaintiff Sentry did not file any Rule 56(e) affidavits which attempted to put in issue any of the factual data relied upon by defendants. We shall therefore consider the factual data contained in that data, including but not limited to that contained in the two affidavits, as undisputed for the same reasons stated in regard to the same question which was presented in the State of Illinois case.
In the same pattern as that followed in the State of Illinois case, we therefore find that the following facts are material and not in dispute in the Sentry case:
1. Sentry Food Stores, Inc. (Sentry) is an Illinois corporation, operating one retail grocery store in Illinois. Stip. ¶ 1.
2. Sentry seeks to represent a class of retail sellers of milk and milk products in the marketing area described in U.S.D.A. Order No. 30, regulating the handling of milk in the "Chicago Regional Marketing Area." The "Chicago Regional Marketing Area" known as Order 30 is described in 7 C.F.R. § 1030.6. Stip. ¶ 2.
3. Sentry complains that defendant combined and conspired to unlawfully restrain and monopolize trade and commerce in raw milk in the Chicago Regional Marketing Area. Stip. ¶ 3.
4. Sentry alleges that defendants combined and conspired to:
(a) fix the price of raw milk in the Chicago Regional Marketing Area;
(b) fix the handling charges for raw milk;
(c) control the supply of raw milk;
(d) control alternative supplies of raw milk from areas outside the Chicago Regional Marketing Area and direct these supplies to other markets;
(e) exclude from competition all persons desiring to engage in the production and sale of raw milk in the Chicago Regional Marketing Area; and
(f) divide and allocate among themselves certain customers and classes of customers. Stip. ¶ 4.
5. Sentry alleges that the effect of defendants' unlawful combination and conspiracy has been to eliminate competition in the production and sale of raw milk and to fix and maintain non-competitive prices for raw milk which is processed and disposed of as fluid milk product and other processed milk products to Sentry. Stip. ¶ 5.
6. Sentry complains that it was injured by reason of defendants' antitrust violations because Sentry was "denied the benefits of unrestricted competition in the production and sale of raw milk which benefits ... would have been passed on directly to [Sentry] ... in the form of lower prices for milk and milk products, ... such prices being traceable, both in origin and amount" to defendants' violations. Stip. ¶ 6.
7. Prior to April, 1979 Associated Milk Dealers, Inc. (AMDI) was an incorporated trade association of ten of the approximately 98 milk processors which at that time sold fluid milk product and other processed milk products in the Chicago Regional Marketing Area, U.S.D.A. Order No. 30. Since April, 1979 and at the present time, AMDI *1334 is an unincorporated association of eight milk dealers who process raw milk and distribute fluid milk product and other processed milk products in the Chicago metropolitan area and in other parts of Illinois. Stip. ¶ 7.
8. AMDI neither buys nor sells milk in any form. Stip. ¶ 8.
9. Plaintiff now asserts that "co-conspirators" (as hereinafter referred to in this Stipulation) include but are not limited to members of defendant AMDI. Stip. ¶ 9.
10. The following is a brief general description of the steps taken by a processor in converting raw milk into typical fluid milk products:
(a) 3.25% Homogenized Milk: Grade A milk from the cow is received for processing at distributing plants directly from the farm or from supply plants. It is weighed, sampled and pumped into storage tanks where it is cooled to about 40 degrees Fahrenheit, tested for butterfat, and standardized at the processing plant to the desired butterfat level. Impurities in the raw milk are removed by a "clarifier," which consists of a set of discs revolving at 5,550 r.p.m.
(b) The milk is then pasteurized by maintaining it at a heat of either 145 degrees for at least 30 minutes (the old method) or over 161 degrees for over 15 seconds (the "High Temperature Short Time" (H.T.S.T.) method). In the H.T. S.T. method, the milk is drawn through the regenerating section of the H.T.S.T., and goes through the homogenizer, a machine composed of pistons which force the milk through a grid to break up the fat globules into tiny particles so that they are evenly dispersed throughout every drop of milk. In the larger H.T.S.T. units, the milk is completely under pressure through the system with a lower pressure being maintained in the regenerative section of the H.T.S.T. The milk is then heated to the proper temperature, held the proper time and cooled to approximately 38 degrees for packaging.
(c) Other Fluid Milk Products: Milk destined for all fluid milk products other than 3.25% homogenized is made up in separate vats, all ingredients added, and then put through the H.T.S.T. First, the milk passes to the separator where it is divided into skim and cream and stored. For chocolate milk, flavorings and sugar are added; for nonfat chocolate milk, a stabilizer is normally added. For Vitamin D milk, vitamins are added; for fortified milk, various fortification agents are added. Then comes the H.T.S.T. and the homogenizer. The milk is then packaged by various types of packaging devices and stored in coolers ready to be loaded for distribution. Stip. ¶ 11.
11. Central Milk Producers Cooperative (CMPC) is a federated association of milk marketing and bargaining cooperatives organized in 1968 whose members market raw milk in the Chicago Regional Marketing Area, Order No. 30. Stip. ¶ 12.
12. Associated Milk Producers, Inc. (AMPI) is a cooperative association of dairy farmers engaged in the marketing of raw milk in the Chicago Regional Marketing Area, Order No. 30. Stip. ¶ 13.
13. Central Milk Sales Agency (CMSA) was organized on July 1, 1967 as an unincorporated joint milk marketing federation of agricultural cooperative associations of producers who market raw milk to handlers regulated under Order No. 30. Stip. ¶ 14.
14. The members of CMPC supplied raw milk to Dean and Certified at the times that plaintiff bought Dean and Certified processed milk and milk products after July 1, 1968. Stip. ¶ 17.
15. Since September, 1968 Hawthorn-Mellody, Meadowmoor and Borden have purchased raw milk from members of CMPC. Stip. ¶ 18.
16. In April of 1970 defendant Associated Reserve Standby Pool Cooperative (ARSPC) was incorporated in the State of Nebraska as a federated agricultural cooperative association of producers for the purpose, among others, of operating a standby pool. Stip. ¶ 19.
17. Neither AMPI, CMPC, CMSA nor ARSPC has ever owned, controlled or had *1335 the right to exercise supervisory authority over management decisions of AMDI or its members. Stip. ¶ 31.
18. AMDI does not sell milk in any form. Stip. ¶ 32.
19. Plaintiff alleges in its complaint that certain co-conspirator members of AMDI sell fluid milk products and other processed milk products. Stip. ¶ 33.
20. Among AMDI's members since July 1, 1968 have been Dean Foods Company (Dean) and Certified Grocers of Illinois, Inc. (Certified). Stip. ¶ 34.
21. The Federal Milk Market Administrator "Handler and Plant List for the Chicago Regional Order as of September 1, 1972" shows that there are approximately 98 separate regulated processed milk and milk products plants in the "Chicago Regional Marketing Area." Stip. ¶ 35.
22. Sentry has never purchased raw milk. Stip. ¶ 36.
23. Sentry has never processed or packaged milk or milk products. Stip. ¶ 37.
24. Plaintiff now asserts that Sentry has purchased fluid milk products and other processed milk products from co-conspirators. Stip. ¶ 38.
25. From April 1, 1946 until September 12, 1969, Sentry bought all of its milk and milk products from Certified. Stip. ¶ 39.
26. Sentry has not been a party to any contract, understanding or arrangement for the purchase of processed milk or milk products on the basis of raw milk cost to Dean or Certified or under any similar "cost-plus" arrangement. Stip. ¶ 40.
27. From September 11, 1969 to date, Sentry has been a member of Centrella Grocers Cooperative, Inc. (Centrella), a cooperative buying association. Stip. ¶ 41.
28. Sentry bought Dean milk and milk products including Dean brand, Fieldcrest brand and Centrella brand, each packaged by Dean, since 1969 which have been delivered by McMahon Dairy Company (McMahon) and billed to Sentry by Centrella. Stip. ¶ 42.
29. Members of Centrella who purchase milk from Hawthorn-Mellody, Meadowmoor or Borden may pay different prices for the same packaged form of processed milk and milk products purchased on the same day from these different milk dealers. Stip. ¶ 45.
30. Increases in a milk processor's cost of raw milk ultimately work their way down to end-users in the marketplace although there is sometimes a lag in the increase of fluid milk product prices which results from increases in raw milk prices. Stip. ¶ 46.
31. The extent to which increases in raw milk cost may result in increases in the price of processed milk products depends upon economic variables including but not limited to competition, excess plant capacity, cost of other raw materials, labor, packaging, energy, delivery, location of buyer with reference to the processor, and volume of purchases. Rittmueller Affid. Ex. C, ¶ 10.
32. Milk processors in the Chicago metropolitan area incur a number of costs in connection with their raw milk supply in addition to the raw milk prices announced by CMPC, or other cooperatives. These costs, which vary among milk processors, include "plant premiums" paid directly to producers, "producer hauling subsidies," expenses of field services, bulk milk hauling, and receiving costs. Rittmueller Affid. Ex. C, ¶ 7.
33. Raw milk accounts for approximately 45 to 60 percent of the total costs incurred by milk processors in processing, packaging and delivering fluid milk and milk products to buyers. Processing, packaging and delivery costs vary among the several milk products depending upon the amount of processing required and the cost of packaging and delivery of each product. The milk processor's costs include, in addition to raw milk cost, in-plant processing (labor, materials, ingredients), packaging (containers), operating supplies, rent, depreciation, energy, taxes, insurance, advertising and general administration. Rittmueller Affid. Ex. C, ¶ 11.
*1336 34. Sentry purchased milk and milk products on the basis of Dean's invoice price subject to rebates as described below. Centrella has nothing to do with the prices charged by Dean. Stip. ¶ 49.
35. Sentry is charged different prices by Dean for Dean brand, Fieldcrest brand, and Centrella brand milk and milk products. Stip. ¶ 50.
36. McMahon Dairy Company (McMahon) has provided exclusive delivery service since 1969 for the delivery of Dean milk and milk products to Sentry. Stip. ¶ 52.
37. Orders for Sentry's milk requirements are given by Sentry to McMahon who records them on order forms supplied by Dean, and who provides that the orders are filled by Dean. Stip. ¶ 56.
38. McMahon received a delivery charge as its compensation for the delivery of milk and milk products to Sentry and other retailers. Stip. ¶ 57.
39. The Dean milk products which were delivered to Sentry were billed by Dean on weekly invoices marked:
 "Sold to: Centrella Grocers
 Sentry Foods, Inc."
Sentry received the invoices from Centrella. Stip. ¶ 58.
40. Centrella pays Dean for the milk products purchased by Sentry. Stip. ¶ 59.
41. Sentry pays Centrella for the Dean milk that is delivered by McMahon. Stip. ¶ 60.
42. Dean rebates 3% to Centrella on billings for Dean products. Centrella retains ½% for its billing services and passes on the remaining 2½% to Sentry and other Dean customers. Stip. ¶ 61.
43. Sentry received a variable rebate from Dean through McMahon, the amount of which depends on Sentry's purchases of Dean milk products delivered by McMahon. Stip. ¶ 62.
44. The amount of the Sentry rebate from Dean "depends upon the product mix that is purchased." Stip. ¶ 63.
45. From 1969 to July, 1974 Sentry received a rebate from Dean of between 25 and 28 percent of the dollar amount of its purchases of Dean processed milk and processed milk products, the exact percentage of the rebate varying according to the product mix purchased by Sentry. Stip. ¶ 64.
46. Sentry's milk rebate from Dean averaged approximately $6,000 per month, or $79,000 to $80,000 a year. Stip. ¶ 65.

B.
Sentry, in much the same pattern as the State of Illinois, does not attempt to place in dispute any of the factual data relied upon by the defendants as material and as controlling. Rather, Sentry suggests that the "additional facts provided in this answering memorandum begin where defendants' Statement of Relevant Facts lets off."
Sentry complains that "defendants do not give facts about the rigid pricing formula used by Dean, nor do they show that milk is an inelastic product, which plaintiff in [its] Argument shows to be a functional equivalent of a cost-plus contract." Sentry contends that defendants improperly stated only the undisputed facts which "support their argument that damages might be difficult to trace." Sentry also argues that the defendants failed "to give the facts that show that AMDI  and Dean as an AMDI member  were members of a price fixing conspiracy."
Although Sentry suggests that the "additional facts" which it argues should foreclose the granting of summary judgment are "set out ... in [its] Argument," those "additional facts" are assumed to be in existence and all discussion of those assumed factual circumstances is intertwined with Sentry's legal arguments. Those arguments attempt to support Sentry's basic contention in regard to its claim that the "issue presented" by the pending motion for partial summary judgment is "whether a plaintiff is barred from suit under a doctrine dealing with indirect purchasers when (1) the record in this case the exception of a cost-plus contract is present; and (2) plaintiff is a direct purchaser as plaintiff's supplier was in a conspiracy with defendants."
*1337 Under that part of Sentry's legal argument entitled "The facts supporting a finding of cost-plus exception," Sentry presents arguments under subheadings entitled (a) "the demand for milk is inelastic" and (b) "Dean engaged in rigid formula pricing." In a later section of its legal argument entitled "facts supporting finding of conspiracy," Sentry contends generally that "the record establishes that AMDI members, including Dean, were equal members of a price-fixing conspiracy."
Although there are legal reasons why both Sentry's cost-plus argument and its co-conspirator argument must be rejected, we shall state the reasons why its discussion of its alleged "facts" can be said to raise, at most, disputes about immaterial rather than material acts within the meaning of Rule 56.

C.
It is somewhat surprising to note that Sentry would even attempt to mount a cost-plus exception argument in this case. For it is clear that paragraph 40 of the parties' stipulation expressly provided that:
Sentry has not been a party to any contract, understanding or agreement for the purchase of processed milk or milk products on the basis of raw milk cost to Dean or Certified or under any similar "cost-plus" arrangement. (Emphasis ours)
In Illinois Brick, the Court noted that the cost-plus exception originally carved out as applicable to defensive pass-on use in Hanover Shoe and extended and made applicable to offensive use of pass-on in Illinois Brick, was an exception of "narrow scope." Indeed, the Court noted that a pre-existing cost-plus contract was the "only example [cited in Hanover Shoe] of a situation where the defense might be permitted." 431 U.S. at 736, 97 S.Ct. at 2069. And the Court made clear that when it talked about a cost-plus exception it expressly had in mind "a pre-existing cost-plus contract" under which a "customer is committed to buying a fixed quantity regardless of price." 431 U.S. at 736, 97 S.Ct. at 2069.
It is clear that paragraph 40 of the stipulation effectively forecloses any possible argument that Sentry could possibly come within any cost-plus exception to the Illinois Brick rule if it is concluded that a literal interpretation must be given to what the Court said about the narrow cost-plus contract exception initially identified in Hanover Shoe and later extrapolated into offensive pass-on theory by Illinois Brick. We have already indicated that it is our considered judgment that the Third Circuit was right when it decided Paper Products and that the Fifth Circuit was wrong in regard to its decision on this point when it decided Beef Industry. (As we note elsewhere, we are satisfied that Beef Industry correctly decided other questions presented in that case which are also presented in the cases which pend in this Court.)
Sentry argues that the like conclusion reached in the Comment, A Legal and Economic Analysis of the Cost-Plus Contract Exception in Hanover Shoe and Illinois Brick, 47 U. of Chi.L.Rev. 743 (1980), that "there is no functional cost-plus exception to the Illinois Brick doctrine" is "a bewildering position." We are, quite to the contrary, satisfied that the Comment's considered forecast that "it seems likely that the Court, if it rules on the functional equivalent doctrine directly, will reject it" is fully supported by the reasons stated in support of that position.
Although we are satisfied that paragraph 40 of the stipulation is a complete legal answer to Sentry's cost-plus contract exception argument, we recognize the existence of the conflict in the rationale upon which the Third Circuit decided Paper Products and that upon which the Fifth Circuit based its decision on that separate question in Beef Industry. Although we are of the view that our Court of Appeals is likely to adopt the rationale and follow Paper Products, as we anticipate will the Supreme Court, we believe that in light of the conflict it is appropriate to state the reasons why Sentry's factual assumptions and legal argument that it would be entitled to a "functional equivalent" of a cost-plus contract *1338 exemption under the Beef Industry rationale are not tenable.
Beef Industry, in its consideration of the "functional equivalent" of a cost-plus contract, twice emphasized that it was considering a dismissal on the pleadings. 600 F.2d at 1164 and 1166. That case also made clear that it was considering allegations of "structural inelasticity" which were "highly inelastic" and allegations of "rigid formula pricing by intermediaries." Id. at 1165 and 1166 (emphasis ours).
While Beef Industry made clear that under the procedural posture of that case it was required to accept the plaintiffs' allegations as true, it believed it necessary to again "emphasize that we are not ruling that these plaintiffs are entitled to go to trial." Id. at 1166. Indeed, Beef Industries concluded that "under the strictures of Hanover Shoe and Illinois Brick, ... the Supreme Court intended that it be determined early in the litigation whether (or to what extent) a party should be entitled to present a pass-on theory at trial" and that, upon remand, "the district court may and should demand from plaintiffs in each case a pretrial demonstration that they have definite and particularized proof that they will need to establish damages." Id. at 1166-67.
The partial summary judgment procedures directed by this Court were designed to afford Sentry a full and fair opportunity to demonstrate that it has the "definite and particularized proof" required to establish a "functional equivalent" exception to the Illinois Brick rule. Sentry recognized that under the stipulated facts in this case it could not possibly establish a cost-plus exception under the interpretation given Hanover Shoe and Illinois Brick by the Third Circuit in Paper Products.
Sentry also recognized that it could not establish "the functional equivalent" of a cost-plus exception as discussed in Beef Industry, unless it could present "definite and particularized proof" that would bring it within the new functional equivalent exception established by the Fifth Circuit in that case. Accordingly, Sentry contends that it has demonstrated that (a) "the demand for milk is inelastic" and (b) that "Dean engaged in rigid formula pricing."
The only "facts" cited by Sentry to support its contention that "the demand for milk is inelastic" are our findings Nos. 126 and 127 in In re Midwest Milk Monopolization Litigation, 510 F.Supp. 443 (W.D. of Mo. 1981). It is true that in the context of that case we made findings that the demand for both fluid and Grade A milk were "relatively" inelastic. It should be obvious, however, that a finding that a demand is "relatively inelastic" simply is not a finding that such a demand was, in fact, "inelastic." Findings of "elasticity" and "inelasticity" in a case involving the application of pass-on theory in an antitrust case relate directly to economic theory. Unless the demand can be shown to be "absolutely," or as some economists say  "perfectly"  inelastic, a court will necessarily become involved in a type of complicated economic analysis which the Illinois Brick rule was designed to avoid. Although the Comment in the Chicago Law Review already cited and the article by Schaefer: Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis, 16 Wm. & Mary L.Rev. 883 (1975), (cited in Illinois Brick, 431 U.S. at 742, n.25, 97 S.Ct. at 2072, n.25) take different views in regard to the Hanover Shoe pass-on legal theory, both articles are in complete agreement in regard to the paramount importance and economic definition of "absolute" or "perfect" inelasticity. The undisputed facts establish that such inelasticity simply is not present in this case.
We therefore find and conclude that Sentry has failed to support its contention that the demand for milk is inelastic. We further find that the data before the Court demonstrates beyond dispute that the demand for raw milk is not inelastic within the meaning of the "functional equivalent" rule. See Illinois Appendix at A6, A36, A38, and A44-45. See also Sentry Appendix at C1-2.

*1339 D.
Sentry's effort to show "that Dean applied a rigid formula to every increase in his raw milk costs to determine how much it would raise its prices" was equally unsuccessful. The portion of the Rittmueller August 31, 1966 testimony relied on by Sentry is not, as Sentry contends, in conflict with his affidavit filed in support of defendants' pending motion. In the portion of the Rittmueller deposition quoted by Sentry it is clear that at that place in his deposition Mr. Rittmueller was being examined in regard to how one could calculate the effect of a per hundredweight cost increase on a per quart basis. When he was asked the direct question of whether there was a "formula for passing on that increase," he testified that there was "no set formula." Indeed, he further testified that there was no "general formula" for passing on any price increase.
Sentry inserted a number of Dean Foods Company price lists for Chicagoland in its brief which Sentry stated were "documents produced by defendants." Those documents are not before the Court in accordance with the requirements of Rule 56(e). But even if it be assumed that those price lists may properly be considered, they do not support a basis for a factual dispute concerning an alleged functional equivalent exemption. The "price adjustments" reflected by those price announcements show on their face that they were made in accordance with the "applicable regulations of the Cost of Living Council" and included only "the cost of raw agricultural products," all in accordance with the then existing Federal controls on prices. Careful examination of the price lists, however, when considered in light of the applicable paragraphs of the stipulation in regard to the manner in which Sentry was charged a number of different prices by Dean, require an express finding that rather than being able to prove the "functional equivalent" of a cost-plus agreement, all of the evidence establishes that Sentry's case presents precisely the type of pass-on case which prompted the establishment of the Illinois Brick rule.
There can be no real question that the evidence establishes that some pass-on was present. The issue, however, is not whether some pass-on occurred but whether the amount of pass-on can be determined in a manner free from the economic complexity which would burden the trial of antitrust cases, as discussed in Hanover Shoe and Illinois Brick. We find that under the undisputed material facts any effort to determine the amount of pass-on would violate the Illinois Brick rule.

E.
The section of Sentry's brief purporting to state "facts supporting a finding of conspiracy" does not require detailed discussion of the various paragraphs which Sentry attempted to have included in the stipulation or the various paragraphs of the stipulation to which Sentry has made reference. Nor do we need to discuss in detail the references made by Sentry to a few pages of deposition testimony and findings culled from our findings in In Re Midwest Milk Monopolization Litigation, supra. This is true because on page 15 of its brief Sentry states that:

The Stipulation agreed upon for this motion summarizes plaintiff's position. Plaintiff alleges a conspiracy to fix the price of raw milk (Stipulation No. 5); plaintiff asserts AMDI members were co-conspirators (Stipulation No. 9); Dean is an AMDI member (Stipulation No. 34); plaintiff alleges that co-conspirator members of AMDI sell fluid milk and plaintiff purchased from Dean (Stipulation Nos. 33, 38). The Stipulation describes the bracket system and states that AMPI (and previously PMA) was the producer's agent for selling milk to AMDI members. (Stipulation Nos. 27, 66) (Emphasis ours)
Sentry's effort to qualify under an alleged co-conspirator exception, on the basis of the facts summarized in the stipulation or otherwise, must fail for a number of reasons. Careful examination of Sentry's complaint in regard to whom Sentry thought the unidentified "co-conspirators" *1340 may have been at the time the complaint was filed, as compared with Sentry's present attempt to identify those still unidentified "co-conspirators," reveals that Sentry attempts to make a similar shift in theory, as that unsuccessfully attempted by the plaintiffs in Beef Industry.
Beef Industry concluded that the plaintiff's new co-conspirator theory first presented in the Court of Appeals was not the theory which plaintiffs had set forth in the complaints filed in the district court. The Beef Industry complaints as filed, as is true of the complaint filed by Sentry in this case, were based on a pass-on theory. We therefore reject Sentry's attempted shift of theory for reasons similar to those stated in Beef Industry in its discussion of the similar question on page 1161 of 600 F.2d.
Careful examination of the stipulation in regard to what companies Sentry actually made its purchases from clearly supports and requires a finding that Sentry was not a direct purchaser from anyone it identified in its complaint as a co-conspirator. The paramount reason why Sentry cannot be included within any claimed co-conspirator exception is the undisputed fact that none of the persons who could be said to be identifiable "co-conspirators" are named as parties defendant in Sentry's complaint. Even if it be assumed that Sentry intended to allege a vertical conspiracy, it is clear that the alleged co-conspirators in such a conspiracy must be named in order to avoid the risk of multiple liability and inconsistent adjudications, so fully discussed in Illinois Brick. See 431 U.S. at 730-731, 97 S.Ct. at 2067.
The files and records in this Court establish that the risk of multiple and inconsistent adjudication in this case is not an imagined risk for the reason that Certified Grocers and Oberweis Dairy, companies which unquestionably dealt more directly with any possible alleged conspiracy, have already instituted actions against the defendants. Other dealer suits are possible, should there be proof of fraudulent concealment in accordance with the discussion in Beef Industry. 600 F.2d at 1169.
For the reasons stated, we find that there are no disputed material facts which prevent the granting of defendants' motion for partial summary judgment.

III.
Both the State of Illinois' first amended complaint (¶ 23) and Sentry's complaint (¶ 21), respectively, allege that each plaintiff was injured when unlawfully fixed higher prices for raw milk were allegedly passed on to each respective plaintiff. Both plaintiffs have stipulated that the product which each claim was unreasonably restrained and monopolized was raw milk; that neither plaintiff has ever purchased raw milk; that neither plaintiff has ever purchased either fluid milk or milk products from any milk processor named as a party defendant in either complaint; and that each plaintiff, in fact, purchased fluid milk and milk products from milk processors who were not named as defendants in either case.
Those stipulated and undisputed facts establish that both plaintiffs are within the "indirect purchaser" rule of Illinois Brick and that defendants are entitled to partial summary judgment unless plaintiff's respective claims that each are within some recognized exception to the Illinois Brick rule present a genuine issue as to some material fact.
The two affidavits filed in support of defendants' motion for partial summary judgment establish that plaintiffs have not raised a genuine issue concerning the material facts in regard to any possible cost-plus exception or a "functional equivalent" to a cost-plus exception. For it is clear that both plaintiffs failed to controvert the factual data contained in those two affidavits, as required by the Eighth Circuit rule most recently applied in Beckers v. International Snowmobile Association, 581 F.2d at 1311 (8th Cir. 1978). In addition, as we have stated in detail, the factual data relied upon by defendant do not present a factual dispute in regard to the facts that the relevant market as defined by plaintiffs was not an "inelastic" market and the pricing practices *1341 followed in that market were not, in fact, based on "rigid formula pricing."
We have studied every case cited by each party to this litigation. We have followed the development of antitrust pass-on theory since the time we wrote a pre-Hanover Shoe case reported as Missouri v. Stupp Bros. Bridge & Iron Works, 248 F.Supp. 169 (W.D.Mo.1965). That case was cited with approval by the Ninth Circuit in In re Western Liquid Asphalt Cases, 487 F.2d 191 (9th Cir. 1973). Indeed, Stupp Bros. Bridge & Iron was cited with approval by the district court, see 67 F.R.D. at 467, when Illinois Brick was decided at the trial court level. But the Supreme Court expressly rejected the rationale of those cases when it concluded in Illinois Brick that a pass-on theory could not be used offensively. See 431 U.S. at 733, 97 S.Ct. at 2068.
Illinois Brick elected to accept the pass-on rationale of Hanover Shoe rather than overrule that case. 431 U.S. at 736, 97 S.Ct. at 2069. In Hanover Shoe the defendant argued that there could be no antitrust recovery "where [an] overcharge is imposed equally on all a buyer's competitors and where the demand for the buyer's product is so inelastic that the buyer and his competitors could all increase their prices by the amount of the cost increase without suffering a consequent decline in sales." 392 U.S. at 492, 88 S.Ct. at 2231. It was in response to that basic economic argument that the Court directed its statements concerning the "insuperable difficulty" of recreating pricing decisions "in the real economic world rather than an economist's hypothetical model." 392 U.S. at 493, 88 S.Ct. at 2231. The arguments presented in this case are thus not dissimilar from those presented and rejected in Hanover Shoe.
Because Illinois Brick accepted and applied the pass-on rationale of Hanover Shoe, the pass-on arguments presented in this case must be rejected. We are satisfied that the cases cited and relied upon by the State and by Sentry are either inconsistent with the rationale of Hanover Shoe and Illinois Brick or are clearly distinguishable from the undisputed factual circumstances presented in the cases which pend in this Court. We do not believe that detailed discussion of each case cited would serve any useful purpose for either the parties or for purposes of appellate review.
We are confident that it is apparent from what we have said above that we are convinced that the Third Circuit's interpretation of Hanover Shoe and Illinois Brick in Paper Products is correct and should be followed. Even if it is assumed that the Fifth Circuit's "functional equivalent" view of the Illinois Brick rule is correct, defendants' motion for partial summary judgment must, nevertheless, be granted because the factual data presented shows that plaintiffs have failed to put in genuine issue the factual data upon which a functional equivalent to a cost-plus contract could be based.
Plaintiffs' asserted "co-conspirator" exception to the Illinois Brick rule must fail for the reasons we have discussed in detail above. We are satisfied that the Fifth Circuit correctly concluded in another part of Beef Industry that the risks of multiple liability and inconsistent adjudications may not be avoided unless the alleged co-conspirators are named as parties defendant in the litigation.
The reasons why we exercise discretion against the State of Illinois in regard to its motion to file still another amended complaint will be stated in the next part of this memorandum opinion.

IV.
The State of Illinois' position in regard to its belatedly filed motion to amend is, to say the least, ambivalent. In our May 6, 1981 memorandum and order we noted that the State of Illinois "rather than comply with the orders entered on March 31, 1981, which were designed to present the Illinois Brick question in an orderly manner ... [elected instead] to file another unnecessary motion which tended to postpone compliance with the March 31, 1981 orders."
The manner in which the State of Illinois describes the amended complaint which it seeks leave to file may not be an accurate *1342 description of that complaint. In the concluding paragraph of its memorandum in opposition to defendants' pending motion, however, the State of Illinois flatly states that "it has been and continues to be the position of the State that its Amended Complaint is sufficient" and that its proposed amendment "seeks merely to clarify the nature of its cause of action." The State of Illinois reiterated that the "amendment does not inject new issues or claims into this proceeding, add parties, alter the theory of recovery, necessitate additional discovery or in any way surprise the defendants in the conduct of their defense."
The disclaimer that the proposed new amended complaint does not in fact inject new issues or claims, alter the theory of recovery, or necessitate additional discovery is an implicit admission that defendants would in fact be prejudiced if the proposed amendments did any of those things.
If the State has accurately stated that its proposed amended complaint "seeks merely to clarify the nature of its cause of action," that it does not seek to "inject new issues or claims," and that it does not seek to "alter the theory of recovery," it is difficult to understand why it seeks leave to file its proposed amended complaint in the first place. Careful study of the proposed Second Amended Complaint with the State of Illinois' First Amended Complaint, however, suggests that the State may be attempting to allege new facts which would attempt to allege a new cause of action based upon a vertical resale price fixing conspiracy. And, we believe quite significantly, the proposed Second Amended Complaint would seek to eliminate all references to over-charges in the price of fluid milk which were allegedly passed on, as alleged in ¶ 23 of the State of Illinois' First Amended Complaint. See ¶ 19 of the State of Illinois' proposed Second Amended Complaint.
Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), makes clear that Rule 15(a) means what it says when it states that leave to amend "shall be freely given when justice so requires." That case also makes clear, however, that justifiable reasons may exist in particular cases which require the exercise of discretion against granting an amendment. Foman v. Davis recognized that reasons such as "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [and] futility of amendment" are the type of reasons which may call for exercise of discretion against the granting of the requested leave. Id. at 182, 83 S.Ct. at 230.
The district court denied plaintiffs in Beef Industry any opportunity to amend their complaint after the Illinois Brick decision, "to allege a vertical conspiracy, and by denying post-judgment requests for leave to amend." The Fifth Circuit upheld the district court's refusal to permit amendment for the reason that "plaintiffs have no credible explanation for their failure to move for leave to amend until nearly five months" after the defendants moved for dismissal on the basis of Illinois Brick. The length of time the State waited to seek leave to file a further amended complaint after the Illinois Brick question was raised in this case is measured in years, rather than months. The difficulties this Court has encountered in regard to getting that question in proper focus are clearly established by the record.
The Fifth Circuit in Beef Industry cited and relied upon familiar principles when it concluded that the value of summary judgment procedures would be dissipated if a party were free to shift theories in an effort to defeat a motion for summary judgment. Beef Industry affirmed the district court for the further reason that the plaintiffs' proposed amendment in that case would have been futile because their allegation concerning an alleged vertical conspiracy would not have brought the actions within any of the recognized exceptions to Illinois Brick. The failure to name alleged co-conspirator middlemen was also cited by the Fifth Circuit as still another reason in support of the district court's exercise of discretion.
*1343 We conclude that despite its apparent disclaimers, the State's Second Amended Complaint must be viewed as an effort on its part to shift its theory by alleging a new set of facts in support of a new cause of action generally based on a resale price maintenance conspiracy theory. We therefore find that in addition to the reasons which prompted the district court to refuse to grant leave to amend in Beef Industry, all of which are present in this case, the State's effort to abandon its original claim and to pursue a new one reflects a dilatory effort on its part to avoid an application of the Illinois Brick rule to the undisputed material factual circumstances of the State of Illinois case. We further find that the new and different cause of action which the State seeks to allege in its Second Amended Complaint would require new discovery and the development of facts which can not be said to arise out of the same transaction or occurrence for the reason that the alleged resale price maintenance theory relates to sales at a different level of the distribution chain than that allegedly involved in all of the State's prior pleadings.
For all the reasons stated, we shall exercise discretion against granting the State's pending motion for leave to file a further amended complaint.
For the reasons stated, it is
ORDERED (1) that defendants' motion for partial summary judgment in State of Illinois et al. v. AMPI, et al., No. 73 CV 78-W-1, should be and the same is hereby granted. It is further
ORDERED (2) that the State of Illinois' motion for leave to file an amended complaint pending in the same case should be and the same is hereby denied. It is further
ORDERED (3) that defendants' motion for partial summary judgment in Sentry Food Stores, Inc. v. AMPI, et al., No. 73 CV 80-W-1, should be and the same is hereby granted. It is further
ORDERED (4) in accordance with and in anticipation of the entry of forms of judgment in a separate document in each case, counsel for defendants shall promptly prepare proposed forms of judgment and, after submission to counsel for plaintiffs for approval as to form, submit the same to the Court for its approval so that the Clerk may enter each judgment in accordance with Rule 58.